*Mark Armacost v. Reginald J. Davis*
No. 69, September Term 2017


**Civil Procedure – Jury Instructions – Medical Malpractice.** Trial court did not abuse its discretion when it gave standard general instructions on negligence and foreseeability in addition to an instruction particularizing the relevant standard of care in a medical malpractice case. Considered as a whole, the court's instructions were not misleading and there was no showing of probable prejudice that would require reversal of the jury's verdict.


**Civil Procedure – Jury Instructions – Modified Allen Charge.** Trial court did not abuse its discretion when it gave a modified Allen charge after the jury sent a note suggesting late in the third day of its deliberations that it might not be able to reach a verdict. The fact that the trial court also advised the jury that it would be required to deliberate for only an hour more was not, in the context of this trial, coercive.

Circuit Court for Baltimore County
Case No. 03-C-14-011973
Argument: October 9, 2018

IN THE COURT OF APPEALS
OF MARYLAND

No. 69

September Term, 2017

_____

MARK ARMACOST

V.

REGINALD J. DAVIS

_____

Barbera, C.J.,
Greene
*Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by McDonald, J.
Hotten and Getty, JJ., concur and dissent.
_____

Filed: January 25, 2019

*Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to Maryland Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.



Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

A judge presiding at a jury trial provides direction to the jury on several topics, including: (1) the law governing its consideration of the evidence – *e.g.,* the burden of proof, direct and circumstantial evidence, the credibility of witnesses, expert testimony; (2) the law governing the specific issues that the jury must decide; (3) the process by which the jury is to conduct its deliberations; and (4) housekeeping matters – *e.g.,* the trial schedule, how to communicate with the court, where and when to report. Most of the court's instructions on the law are given after the close of the evidence, but certain instructions may be given at the outset of the trial, during its course, or in response to jury questions or notes. A trial court enjoys a fair amount of discretion in what it tells the jury, although any instructions it gives must be consistent with the law.

This case concerns two sets of instructions given in a medical malpractice case. The action was brought by Petitioner Mark Armacost against Respondent Dr. Reginald Davis, a neurosurgeon at the Greater Baltimore Medical Center ("GBMC"), who had performed surgery on Mr. Armacost. A jury in the Circuit Court for Baltimore County returned a verdict finding that Dr. Davis had been negligent.

The first set of jury instructions at issue was given at the close of the evidence and concerned what is necessary to prove medical malpractice. The trial court recited standard pattern instructions on negligence, foreseeability, and causation before particularizing the standard of care applicable to a health care provider – *i.e.*, that the provider must exercise the "degree and skill which a reasonably competent health care provider engaged in a similar practice and acting in similar circumstances would use." Dr. Davis contends that,

while all of these instructions correctly state the law, the trial court misled the jury as to the standard of care applicable to his conduct when it prefaced the instruction on the standard of care applicable to health care providers with two of the general negligence instructions.

The second set of instructions at issue was given on the third day of jury deliberations after a jury note suggested that the jury might be deadlocked. In response, the trial court urged the jurors to give careful consideration to each other's views while not surrendering a sincerely held belief – what is known as a "modified Allen charge." The court also informed the jury, some of whose members had expressed concerns about the trial schedule throughout the trial, that it would require the jury to deliberate only for another hour and would not ask them to return for a fourth day of deliberation. After engaging in additional deliberation that afternoon, the jury returned its verdict. Dr. Davis contends that the modified Allen charge, coupled with the information that the jury's deliberations would come to an end soon, was "unduly coercive."

We hold that, while the trial court's instructions on the applicable law might have been phrased better, those instructions, considered as a whole, did not mislead the jury as to the applicable law. Nor has Dr. Davis demonstrated, on the record of this case, the probable prejudice necessary for reversal of the jury's verdict.

We also hold that the trial court did not abuse its discretion in giving the modified Allen charge. In the context of a case in which the jurors had expressed concern about the court's schedule during the trial, it was not an abuse of discretion to advise the jury how long it would be required to continue its deliberations.

# I

## Background

The legal questions that we must answer in this case concern certain jury instructions given by the trial court. Resolution of these questions does not depend on the precise allegations of medical malpractice that were at issue at trial. To provide some context, however, we briefly summarize those allegations and the testimony at trial, as well as the pertinent instructions that were given.

### A.    *Facts*

In January 2012, Mr. Armacost first visited Dr. Davis. Mr. Armacost told Dr. Davis that he had recently begun to experience numbness in two fingers of his right hand, and that he had suffered intermittent neck and shoulder pain in the past. Dr. Davis recommended surgery. The surgery was performed in March 2012 at GBMC. Dr. Davis removed damaged discs from Mr. Armacost's spine and fused vertebrae in his neck.

Sometime after the surgery, an infection developed at the location of the operation. Mr. Armacost made additional visits to GBMC and to various physicians, including Dr. Davis, and was hospitalized in August 2012 as a result of the infection. When this case was tried in 2016, Mr. Armacost was still afflicted with neck pain and hampered by a severely limited range of motion.

### B.     *Court Proceedings*

*The Complaint*

On November 3, 2014, Mr. Armacost filed suit against Dr. Davis and GBMC in the Circuit Court for Baltimore County.[1]  The first count of the complaint alleged negligence – that is, that the treatment of Mr. Armacost violated the standard of care expected of reasonably competent health care providers.  The second count of the complaint alleged a failure to obtain informed consent – that is, that Dr. Davis and GBMC had failed to inform Mr. Armacost of the risks and of appropriate alternatives for treatment at the time he agreed to undergo the surgery.  The complaint stated that Mr. Armacost had suffered various injuries and damages as a result of the alleged negligence and failure to obtain informed consent.  Dr. Davis and GBMC each filed an answer raising various defenses and denying liability.

*Jury Selection and Management*

The trial began on Tuesday, May 17, 2016.  During jury selection, the trial court informed the jury venire that the trial was expected to last seven days and would "finish on no later than Wednesday, May 25th" – shortly before the Memorial Day weekend.  As is sometimes the case during trials of moderate length, the court was called upon to address the concerns of several jurors about its duration.

---

[1] As required by Maryland law, Mr. Armacost initially filed a statement of claim with the Health Care Alternative Dispute Resolution Office.  In accordance with the statute, a certificate of merit by a qualified expert in neurosurgery was attached to the statement of the claim and Mr. Armacost waived arbitration before filing his complaint in the Circuit Court.  Maryland Code, Courts & Judicial Proceedings Article, 3-2A-01 *et seq.*

The first day of trial was consumed by jury selection and opening statements. The trial court seated a jury of six jurors and two alternates. At the outset of the second day of trial, one of those jurors asked to be excused on the ground that he was the caregiver for his elderly grandfather, who had a medical appointment later that week – a concern that he had not raised during voir dire. The trial court was reluctant to lose a juror so early in the trial and initially denied the request. The juror repeated the request the next day and the court eventually acceded to it, excusing that juror at the end of the third day of the trial.

On the third day of the trial, the trial court noted that other jurors were "concerned about the length of the trial" and that three had asked for letters, presumably for their employers. The trial court provided letters reiterating that the trial was scheduled to "go until Wednesday, May 25," advised the jury that counsel were conducting the trial very efficiently, and stated that the case would likely be submitted to the jury by Tuesday, May 24, although the court said it could not predict how long their deliberations might take.[2] (In fact, the case was ultimately submitted to the jury on Monday, May 23, a day earlier than the court's prediction).

*Trial Testimony*

During the plaintiff's case, Mr. Armacost, his parents, and his son testified as to Mr. Armacost's background, physical condition, and treatment. An expert neurosurgeon

---

[2] The trial court generally appears to have been concerned about making efficient use of the jury's time. For example, on two occasions, the court chastised counsel for attempting to litigate motions while the jury was waiting in the jury room rather than raising those motions before the jury arrived or after it had been dismissed.

testified that the procedure performed by Dr. Davis, while done proficiently, was neither medically necessary nor even appropriate for a patient with Mr. Armacost's medical history and that Mr. Armacost's symptoms would likely have dissipated under more conservative care.[3] The expert also testified that the post-operative infection was a result of the surgery and should have been detected, diagnosed, and treated sooner. During the defense case, an expert neurosurgeon and an infectious disease specialist, as well as Dr. Davis himself, testified that the surgery was an appropriate treatment and that the subsequent infection had been present only for a couple of weeks before it was caught.[4]

*Jury Instructions*

On May 23, 2016, after three days of testimony, the trial court instructed the jury on the law governing its decision. As is typical, most of those instructions provided guidance to the jury on such things as how to consider the types of evidence it heard, what burden of proof to apply, and how to complete the verdict sheet to communicate its verdict on the issues in the case. With respect to the law governing the two claims asserted by Mr. Armacost, the trial court began with general instructions concerning the law of negligence and then focused on the particular standard of care pertaining to health care providers and

---

[3] Excerpts from Dr. Davis' deposition testimony were played during the plaintiff's case. Mr. Armacost also presented the testimony of a physician certified in rehabilitative medicine who testified concerning Mr. Armacost's condition after the operation, the relationship of that condition to the surgery, and likely future treatment. An expert in lifecare planning and case management testified concerning the likely course and cost of Mr. Armacost's future care in light of the rehabilitation specialist's recommendations.

[4] The defense also called a nurse from GBMC who testified about the treatment of Mr. Armacost's post-surgical infection.

the requirement that a physician obtain informed consent from a patient before providing treatment.

The court largely drew its instructions from "pattern instructions" for civil cases developed by the Standing Committee on Pattern Jury Instructions of the Maryland State Bar Association ("MSBA").[5] Three such instructions given by the trial court are pertinent to the first issue in this appeal. In particular, the court recited the general pattern instruction on negligence (MPJI-Cv 19:1) followed by the related instruction on foreseeability (MPJI-Cv 19:3).[6] Those instructions use the familiar standard in negligence law of the hypothetical "reasonable person." The trial court told the jury:

> Negligence is doing something that a person using reasonable care would not do or not doing something that a person using reasonable care would do. Reasonable care means that caution, attention or skill a reasonable person would use under similar circumstances.
>
> A reasonable person changes conduct according to the circumstances and the danger that is known or would be appreciated by a reasonable person. Therefore, if the foreseeable danger increases, a reasonable person acts more carefully.

---

[5] The pattern instructions for civil cases currently appear in Maryland State Bar Association, Maryland Civil Practice Jury Instructions (5th ed. 2018) and are given numerical designations preceded by "MPJI-Cv." These pattern instructions, which were developed by a committee of the bar association, have no official status that requires a trial court to use them. Nevertheless, like the pattern instructions for criminal cases, they are the product of consensus of experienced practitioners and judges, and this Court has, on occasion, encouraged their use. *See, e.g., Ruffin v. State*, 394 Md. 355, 373 (2006).

[6] The pattern instruction on foreseeability in the current edition of the civil pattern instructions differs slightly from the version used by the trial court in 2016, although the changes appear to be of form rather than substance.

7

The trial court followed those two instructions with the general pattern instruction on causation and then gave a pattern instruction that specifically addresses negligence of a health care provider (MPJI-Cv 27:1).[7] The latter instruction particularized the standard that the jury should apply to the benchmark of a "reasonably competent health care provider." In reciting the pattern instruction verbatim, the trial court told the jury:

> A health care provider is negligent if the health care provider does not use that degree of care and skill which a reasonably competent health care provider engaged in a similar practice and acting in similar circumstances would use.

The trial court then gave the jury the pattern instruction on informed consent.[8]

---

[7] Subsequent to the trial of this case, this pattern instruction was reworded slightly and renumbered as MPJI-Cv 27:2 in the latest edition of the MSBA's pattern instructions.

[8] In giving that instruction, the trial court stated:

> Before a physician provides medical treatment to a patient, the physician is required to explain the treatment to the patient and to warn of any material risks or dangers of the treatment, so that the patient can make an intelligent and informed decision about whether or not to go forward with the proposed treatment. This is known as the doctrine of informed consent.
>
> In fulfilling the duty to disclose, the physician is required to reveal to the patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the proposed treatment and any alternatives, and the material risks of unfortunate outcomes associated with such treatment.
>
> A material risk is defined as a risk which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to have the particular medical treatment or procedure.
>
> The physician's duty to disclose material risks to the patient is based upon an objective standard rather than a subjective standard. This means that the question of whether a risk is a material risk is based upon whether a reasonable person in the position of the patient would have

At the conclusion of all of its instructions, the trial court paused to allow counsel to place on the record any exceptions to the instructions. Pertinent to this appeal, counsel for Dr. Davis objected to the foreseeability instruction, with specific reference to how it would affect the jury's consideration of the claim of lack of informed consent. He told the trial court:

> I respectfully except to your decision to give the model pattern jury instruction 19:3, foreseeable circumstances.
>
> I think that instruction is intended for situations where the question is whether or not someone would have seen … should have reasonably foreseen trouble in the future such as a wet road, some sort of mechanical failure, a failure of [brakes] on a car, some sort of defect in a product that could foreseeably cause harm to people in the future, perhaps a defect in a sidewalk or stairs or something of that nature.
>
> I think that in this instance the foreseeable circumstances instruction complicates matters because we are talking about informed consent. We are talking about material risks and I believe giving the foreseeable circumstances instruction confuses the notion of whether or not Doctor Davis had to see into the future as to what may or may not happen with Mr. Armacost and therefore had a heightened duty to act in a different way.
>
> The question for Doctor Davis in this case is . . . was he negligent, did he do a surgery that wasn't indicated, did he fail to advise the Plaintiff about the surgery, and did he fail to properly appreciate the signs and symptoms of infection postoperatively.

---

considered the risk to be a material risk. Whether the patient would have consented to the procedure, if informed of the risk, is a relevant factor to be considered, but is not conclusive.

The physician is not required to divulge all risks, but only those which are material to the intelligent decision of a reasonably prudent patient.

> There are no facts in this case which would suggest that Doctor Davis had any duty beyond the normal standard that would apply to a health care professional to foresee what may happen to Mr. Armacost in the future, and I think giving the foreseeable circumstances instruction under the facts of this case, given the notion of informed consent, and what is or is not a material risk, I think it implies that there is perhaps some heightened duty on Doctor Davis because he should have foreseen that Mr. Armacost didn't … wouldn't have the outcome that he hoped for or something of that nature….

Counsel for GBMC also adopted that exception. The trial court took no action in response to the exception, referring to it as the "one divisive issue" concerning the instructions. Neither defense counsel objected to the general pattern instructions on negligence or causation – or to the instructions that particularized the standard of care for health care providers and that stated the obligation to obtain informed consent.

Closing arguments of counsel ensued and the jury retired to deliberate for the remainder of that day. Deliberations continued during the next day and for most of a third day as well.

*Jury Deliberations and Modified Allen Charge*

Late in the day during the first day of their deliberations (Monday, May 23), the jurors sent two notes to the court, one of which asked when they would be able to stop deliberations on that day. The court brought the jurors into the courtroom and dismissed them for the day, with directions to return early the next day to continue their deliberations.

Similarly, late in the day on the second day of deliberations (Tuesday, May 24), the jury sent a note indicating that they were "undecided" and asking the court to recess their deliberations until the next day. The court brought the jury back into the courtroom,

acknowledged the note and that "you have had a long day today of deliberations," and recessed the trial until the next morning.

At approximately 2:00 p.m. on the third day of deliberations (Wednesday, May 25), the jury sent two notes to the trial court. One note expressed a juror's concern about child care. The second note asked what would happen if the jury was unable to reach a decision.

By the time the court and counsel convened to discuss the notes, the child care issue had apparently been resolved. In response to the second note, the court proposed to bring the jury back into the courtroom, to give a "modified Allen charge"[9] encouraging the jury to reach a resolution, and to allow the jury an additional hour for deliberation to see if the jurors could agree upon a verdict. Neither the court nor counsel discussed whether or how the court should answer the jury's question as to what would happen if they failed to reach a verdict. Nor did they discuss the precise wording of the modified Allen charge. Counsel

---

[9] The term "Allen charge" derives from a jury instruction approved by the United States Supreme Court to be given to a deadlocked jury in a criminal case. *Allen v. United States*, 164 U.S. 492, 501 (1896). While this Court has disapproved use of the traditional Allen charge in Maryland courts, the Court has endorsed a similar jury instruction developed by the American Bar Association ("ABA") that eliminated language in the traditional Allen charge that was thought to be coercive. *See Nash v. State*, 439 Md. 53, 90-91 (2014); *Goodmuth v. State*, 302 Md. 613 (1985). Such an instruction is often referred to as a "modified Allen charge." The traditional Allen charge emphasized a need for the jury's minority faction to reconsider the views of the jury's majority faction; a modified Allen charge encourages all of the jurors to deliberate and reconsider their respective positions while not surrendering individual honest convictions. *Burnette v. State*, 280 Md. 88, 92-98 (1977).

The MSBA has incorporated modified Allen charges in its pattern jury instructions for civil and criminal cases. MPJI-Cv 1:21 ("Deadlocked Jury Charge" for civil cases); MPJI-Cr 2:01 ("Jury's Duty to Deliberate" for criminal cases).

11

for Dr. Davis did express concern about giving a modified Allen charge, although not about

concluding the jury's service that day.  The following colloquy ensued:

| | |
|---|---|
| Counsel for Dr. Davis: | I know that the Allen charge is relatively widely recognized but I would object to it being given.<br><br>I think it unfairly indicates to people that they should sway their views and perhaps give up a position that they hold very firmly.<br><br>I think the way that it is worded and the manner in which the language is utilized in many of the versions that I have seen tends to be persuasive and I don't think that it is a, a very good tool for the process that we are trying to engage in.<br><br>Obviously, these people have been at it for some time and there are very clearly held views and, frankly, there may be five people in favor of Doctor Davis and GBMC, and one person holding out.  And so the Allen charge would potentially work in my favor but the opposite could also be true, and I think that if people are back there and they have views that they hold strongly, that they have held most strongly as they obviously have for this long, and charge is un, unfairly persuasive and prejudicial.  And so I would just object to it.<br><br>I would, I would ask the jury be given to the end of the day without it.  And if they can't, at that point in time I would move for mistrial. |
| Court: | Not responding to this note for two hours?  Just let them sit in there and stew, that's your proposal? |
| Counsel for Dr. Davis: | Oh, no, Your Honor.  I would bring them out and say we would ask that you continue your deliberation, your jury deliberations and attempt to reach a unanimous conclusion. |

12

Court: All right. I feel as though they have already done that. They told us yesterday undecided, and so they said that yesterday and we just let them go home. So we already gave them that chance.

They have been here all day today. It's 2:15. So, all right. Let's bring them out.

When the jury returned to the courtroom, the trial court first responded to the jury's question about the consequences of a hung jury:

If eventually the jury is unable to reach a unanimous decision, a mistrial will be declared, and the parties would decide then if they were to try the case again or take some other actions. It would be up to them.

The court then gave the modified Allen charge:[10]

[Y]our verdict must represent the considered judgment of each juror. To return a verdict it is necessary that each juror agree. Your verdict must be unanimous.

Do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

It is your duty as jurors to consult with one another, and we know that you have been doing that since you began your deliberations. It is your duty to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment.

Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if you are convinced it is erroneous.

---

[10] This instruction was virtually verbatim the version of the modified Allen charge, also called the "Deadlocked Jury Charge," that appears in the MSBA's civil pattern jury instructions. *See* MPJI-Cv 1:21.

Finally, the court advised the jurors as to how long they would be kept at the courthouse that day and whether they would be required to return the next day:

> So I'm going to ask you to deliberate another hour. I know that you have been at it pretty hard. We have been in the courtroom and have heard you from time to time. We can't hear what you say. We just hear words being said.... And we will see if you can reach a verdict today.... I'm not going to ask you to return tomorrow, but I do want you to try again.

*The Verdict*

An hour later, the court and counsel returned to the courtroom and the court stated that, as it had previously indicated, it would excuse the jury as "[w]e have not heard anything from them." At that moment, however, the clerk informed the court that the jury had reached a verdict. The jury was brought back to the courtroom and rendered that verdict.

In its verdict, the jury found that Dr. Davis, and GBMC as his employer, were negligent in the treatment of Mr. Armacost and that the negligence had caused injury to Mr. Armacost. The jury answered "no" to questions on the special verdict form as to whether the defendants had failed to obtain informed consent from Mr. Armacost and whether GBMC was negligent other than as Dr. Davis' employer. The jury awarded damages for past and future medical expenses and noneconomic damages in a total amount of $329,000. The Circuit Court entered a judgment in favor of Mr. Armacost in the amount awarded by the jury.

14

*The Appeal*

Dr. Davis appealed. The Court of Special Appeals reversed, holding that the trial court abused its discretion when it included the pattern jury instructions on general negligence and foreseeability in its initial charge to the jury. The intermediate appellate court also held that, while it was appropriate to give the modified Allen charge on the third day of deliberations, the trial court abused its discretion when it coupled that instruction with the information that jury deliberations would continue for just one more hour. 234 Md. App. 71 (2017).

Mr. Armacost filed a petition for writ of *certiorari* with respect to both issues, which we granted.

**II**

**Discussion**

**A.    *Standard of Review***

Both issues in this appeal concern jury instructions given by the trial court. As a general rule, an appellate court reviews a trial court's decision to give a particular jury instruction under an abuse of discretion standard. *CSX Transportation, Inc. v. Pitts*, 430 Md. 431, 458 (2013); *Thompson v. State*, 393 Md. 291, 311 (2006). A trial court abuses its discretion if it commits an error of law in giving a particular jury instruction. *Harris v. State*, 458 Md. 370, 406 (2018). In assessing an instruction given by a trial court, a reviewing court must determine if the instruction at issue was a correct exposition of law and whether it was applicable to the case at hand. *State v. Bircher*, 446 Md. 458, 462-63 (2016). The reviewing court is to consider the adequacy of jury instructions "as a whole"

and not view particular instructions in isolation. *Schwier v. Gray*, 277 Md. 631, 637 (1976); *CSX Transportation*, 430 Md. at 458.

With respect to a modified Allen charge that is given during the course of jury deliberations, an appellate court is to apply a similar deferential standard of review to the trial court's decision to give such an instruction. *See Kelly v. State*, 270 Md. 139, 143 (1973) ("[E]very case is different and each jury panel unique, [so] the decisions as to whether to utilize an Allen-type charge, when to employ it, and what words should be selected are best left to the sound discretion of the trial judge").

In a civil case, a legal error in a jury instruction does not necessarily mandate reversal. To overturn a jury verdict, a jury instruction must not only be incorrect legally, but also prejudicial. *CSX Transportation*, 430 Md. at 458; *Barksdale v. Wilkowsky*, 419 Md. 649, 657 (2011). In other words, "[i]t has long been the policy in this State that this Court will not reverse a lower court judgment if the error is harmless." *Flores v. Bell*, 398 Md. 27, 33 (2007). The party that seeks to overturn the jury verdict in a civil case on the basis of an erroneous jury instruction has the burden of demonstrating that prejudice was not just possible, but probable, in the context of the particular case. *Barksdale*, 419 Md. at 658-70.

## B. *The General Negligence and Foreseeability Instructions*

### 1. Inclusion of the General Negligence Instruction

*Preservation*

Mr. Armacost contends that Dr. Davis did not preserve an objection at trial to the general negligence instruction – pattern instruction MPJI-Cv 19:1. He argues that the

16

Court of Special Appeals abused its discretion when it considered the appropriateness of that instruction and ruled against him.

Maryland Rule 8-131(a) provides that an appellate court "ordinarily" will decide only issues raised in or decided by the trial court. The inclusion of the word "ordinarily" in the rule obviously leaves open the possibility that an appellate court may review an issue that technically was not preserved by objection in the trial court. *State v. Bell*, 334 Md. 178, 188 (1994). For example, as the rule indicates, an appellate court may decide an unpreserved issue "if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." Maryland Rule 8-131(a).

It is true that Dr. Davis did not object to the general pattern instruction on negligence (MPJI-Cv 19:1) – or, for that matter, causation – either at trial or in his briefs in the Court of Special Appeals. But there is no dispute that Dr. Davis did preserve an objection as to the trial court's general pattern instruction on foreseeability (MPJI-Cv 19:3).[11] As indicated above, an appellate court charged with reviewing the appropriateness of a particular instruction should examine the jury charge as a whole. The general negligence

---

[11] It is the practice in many trial courts for the trial court to hold a charge conference with counsel after the close of evidence. At that conference the substance of the court's jury instructions are discussed and counsel may make suggestions or articulate objections. Such a conference may eliminate some objections or objectionable instructions – or at least help ensure that counsel later "state distinctly" the grounds for any remaining objections, as required by Maryland Rule 2-520(e). *See Fowler v. Benton*, 245 Md. 540, 549-50 (1967) (noting that such conferences can have the "salutary effect of promoting errorless instructions and more orderly jury arguments"); P.V. Niemeyer, et al., Maryland Rules Commentary (4th ed. 2014) at 562 (describing the use of charge conferences in federal district court). It does not appear from the record that the trial court held such a conference in this case.

and foreseeability instructions were closely related both in subject matter and in proximity in the court's instructions. The Court of Special Appeals could have declined to address Dr. Davis' belated argument concerning the general negligence instruction. However, in considering the appropriateness of the general foreseeability instruction, it was well within that court's discretion to also address the general negligence instruction for guidance of the trial court on remand. *See Roary v. State*, 385 Md. 217, 225-26 (2005). Although it is revealing, as we indicate below, that counsel for Dr. Davis did not object to the general negligence instruction at trial, we will not avoid addressing the issue on the ground of lack of preservation.

*The General Negligence Instruction*

This Court has characterized "any … medical malpractice tort" as a "traditional negligence claim." *Dehn v. Edgecombe*, 384 Md. 606, 618-19 (2005). Thus, "the general principles which ordinarily govern in negligence cases also apply in medical malpractice claims." *Shilkret v. Annapolis Emergency Hosp. Ass'n*, 276 Md. 187, 190 (1975). Those general principles are well known. In a tort action based on allegation of negligence, the plaintiff must establish at trial (1) the duty of the defendant based on the applicable standard of care, (2) breach of that duty, (3) causation that relates that breach to the plaintiff's injury, and (4) damages. *Dehn*, 384 Md. at 619.

Generally, the applicable standard of care in a negligence action is whether the defendant acted reasonably as measured against a hypothetical "reasonable" similar actor in similar circumstances. *See* Prosser & Keeton on Torts (5th ed. 1984), §32 at 173-75; *State for the Use of Chenoweth v. Baltimore Contracting Co.,* 177 Md. 1, 19 (1939); *M.A.*

18

*Long Co. v. State Accident Fund*, 156 Md. 639, 650 (1929). The conduct of a member of a profession who has special training and expertise is thus measured against the standard of a hypothetical reasonable person with similar training and expertise. Such a professional owes a special duty of care to a client or patient that is beyond the duty that would be owed by a general member of the public and that is commensurate with the professional's training and expertise. *See Jacques v. First National Bank*, 307 Md. 527, 541 (1986).

Because the duty of care owed by a professional is based on the special expertise of the professional, its contours may not be a matter of common knowledge. In order to bring an action holding such a defendant to that more demanding standard of care, a plaintiff may be required to meet certain threshold requirements, such as providing a certificate of a qualified expert supporting the plaintiff's claim. *E.g.*, Maryland Code, Courts & Judicial Proceedings Article ("CJ"), §§3-2A-04, 3-2C-02; *see generally Davis v. Frostburg Facility Operations, LLC*, 457 Md. 275, 285-87 (2018); *Heavenly Days Crematorium, LLC v. Harris, Smariga & Associates, Inc.*, 433 Md. 558, 561 (2013). In addition, at trial, expert testimony may be necessary to assist a lay jury in understanding the extent of the enhanced duty created by that expertise and whether that duty was breached in particular circumstances. *See Meda v. Brown*, 318 Md. 418, 428 (1990) (apart from the occasional "obvious injury" case, expert testimony is generally necessary to establish negligence and causation in a medical malpractice case); *Shilkret, supra*. Appropriate jury instructions direct the jury to the standard of care and its consideration of that expert testimony.

When the general principles of negligence are particularized to the actions of a physician diagnosing and treating a patient, the "physician is under a duty to use that degree

of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances." *Shilkret,* 276 Md. at 200; *see also Dingle v. Belin*, 358 Md. 354, 368 (2000) (A "plaintiff must show that the doctor's conduct – the care given or withheld by the doctor – was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time"); CJ §3-2A-02(c)(1) (same). Thus, under Maryland law, the standard of care applicable to a physician in a negligence action is derivative of the general standard of care in negligence actions, as informed by expert testimony about what a reasonably competent similar practitioner would do in the same circumstances.[12] *Shilkret*, 276 Md. at 190-91.

---

[12] Some authorities prefer to characterize the standard of care applicable to a professional like a physician as an entirely separate standard governed by the customs of the particular profession. *See* J.L. Diamond, et al., Understanding Torts (6th ed. 2018) at 90 (in a medical malpractice case, "a reference to a 'reasonable doctor' is an imprecise statement of the appropriate standard of care … the standard is set by custom …"); D.B. Dobbs, et al., 2 The Law of Torts (2d ed. 2011) at 159 ("The medical standard [of care] is often understood to be the medical custom …"); *but see* S.E. Pegalis, 1 *American Law of Medical Malpractice* (2005) at 135 (Custom and practice in the medical profession may be a measure of the standard of care but "that is not always the case").

As the precedents quoted in the text demonstrate, Maryland law has never delegated the standard of care applicable to a profession entirely to the custom and practice of the particular profession. This is consistent with the law's general reluctance to yield the application of legal standards and oversight of the conduct of a trade or profession entirely to members of that trade or profession. *See Texas & Pacific Railway Co. v. Behymer*, 189 U.S. 468, 470 (1903) (Holmes, J.) ("What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence"); *cf. North Carolina Board of Dental Examiners v. Federal Trade Commission*, 135 S.Ct. 1101 (2015) (state dental regulatory board that was dominated by dentists not entitled to antitrust immunity).

As outlined earlier, in this case, the trial court instructed the jury on the standard of care applicable to a health care provider like Dr. Davis (MPJI-Cv 27:1). No objection has been raised to the correctness of that instruction. Rather, Dr. Davis argues that the court should not have prefaced that instruction with the general instruction on negligence – specifically, MPJI-Cv 19:1.[13] Dr. Davis contends that the trial court abused its discretion in giving that instruction and that the jury may have become confused as to how to assess his conduct, to his detriment.

No decision of this Court has suggested that a trial court necessarily errs in a medical malpractice action when it prefaces the standard of care applicable to a professional, such as a physician, with instructions that outline the general principles applicable in a negligence action. The heightened standard of care applicable to a professional, acting within the scope of that profession, is derived from the general standard of care – both require the decisionmaker to compare the defendant's conduct to a hypothetical reasonable counterpart. It is not surprising, perhaps, that this Court's opinion in *Kennelly v. Burgess*, 337 Md. 562 (1995), prominently quotes a jury instruction in a medical malpractice case in which a general negligence instruction precedes the standard of care instruction applicable to a physician. *Id.* at 569-70. In the instructions in that case, the trial court told the jury, among other things, that "the word malpractice and the word negligence [are]

---

[13] Although Dr. Davis also contends the trial court abused its discretion in giving the general negligence instruction on foreseeability, see Part II.B.2 of this opinion, he apparently does not fault the court for giving the general negligence instruction on causation.

21

synonymous in their meanings" and "[g]eneral rules of negligence apply to malpractice cases …." *Id.* The trial court further instructed the jury that "negligence is doing something that a person using ordinary care would not do," and stated that a physician's conduct is to be compared to the that of "a reasonably competent physician under the same or similar circumstances." *Id.* On appeal, neither party (nor the Court of Special Appeals nor this Court) raised any issue concerning the propriety of that part of the trial court's instructions and, accordingly, neither appellate court explicitly addressed the issue before us in this case. However, in assessing another instruction that was the basis of the appeal, both appellate courts reviewed the trial court's instructions "as a whole" and found no basis for reversal other than the instruction being challenged. Thus, neither appellate court found the inclusion of an instruction concerning general negligence principles erroneous on its face.[14]

Appellate courts in other states have considered the relationship of a general negligence instruction to an instruction particularized for a medical malpractice claim.

---

[14] The issue decided in *Kennelly* concerned another portion of the trial court's instructions on negligence – the propriety of an instruction that "an unsuccessful result following medical treatment is not evidence of negligence." 337 Md. at 569-70. The Court of Special Appeals reviewed the trial court's instructions "as a whole" and concluded that consideration of the "total charge" did not warrant reversal of the jury verdict. 99 Md. App. 171, 191-207 (1994). This Court concluded that the "unsuccessful result" instruction was redundant of the trial court's other negligence instructions and had the potential to confuse the jury as to whether an expert witness could consider an unsuccessful result in forming an opinion on whether the standard of care had been breached. In the course of reaching that conclusion, the Court opined that "[i]n the instant case, proper instructions on negligence, proximate cause, and the appropriate burden of proof adequately convey the applicable law to the jury." 337 Md. at 577.

22

Most of those cases appear to arise out of situations in which a trial court declined to give a general negligence instruction in addition to a specific instruction concerning physician negligence. For the most part, those cases have held that the trial court was *not required* to give the general negligence instruction. On the other hand, most of those cases do not indicate that such an instruction would be prohibited. For example, in *Burns v. Metz*, 513 N.W.2d 505, 508-9 (Neb. 1994), the court upheld a trial court's decision not to give a general definition of negligence when its instruction on "professional negligence" adequately conveyed the "higher standard of care" that the defendant physician was required to satisfy. *See also Robertson v. Richards*, 769 P.2d 505, 510, 534 (Idaho 1987) (not error for trial court to decline to give general negligence instruction when it gave instruction customized to medical malpractice cases); *Hales v. Pittman*, 576 P.2d 493, 498 (Ariz. 1978) (not error to decline to give general negligence instruction when court gave instructions specifically framed in terms of a physician); *Daly v. Carmean*, 568 N.E.2d 955, 963 (Ill. App. 1991) (same); *Putensen v. Clay Adams, Inc.*, 91 Cal. Rptr. 319, 334 (Ct. App. 1970) (same).

The only case we have found that offers a basis for a conclusion contrary to the one we reach, other than the decision of the Court of Special Appeals in this case, is a recent Georgia decision.[15] *Southeastern Pain Specialists, P.C. v. Brown*, 811 S.E.2d 360 (2018).

---

[15] Another decision, by the Illinois intermediate appellate court, stated, without any analysis, that "ordinary negligence" instructions and "medical malpractice" instructions should not be given in the same case, but did not discuss the issue because it found that the issue had been waived in that case. *See Harrington v. Rush-Presbyterian-St.Luke's Hospital*, 569 N.E.2d 15, 19 (Ill. App. 1990).

In that case, the plaintiffs asserted – and explicitly argued to the jury – alternative theories of liability against the defendant physician and related defendants. One theory of liability was based on an alleged breach of the standard of care applicable to "ordinarily careful persons."[16] The other theory of liability argued by the plaintiffs was based on an alleged breach of the standard of care applicable to health care providers. The Georgia Supreme Court accepted the premise that plaintiffs could pursue both theories of liability against the defendants. However, it held that to prove a breach of a duty requiring medical judgment, expert testimony would be necessary "to overcome the *presumption* that the provider acted with due care." 811 S.E.2d at 366 (emphasis added). It reversed the verdict in favor of the plaintiffs on the ground that the trial court's instructions – and the plaintiffs' jury argument – had allowed the jury to find that the physician had committed ordinary negligence on certain claims without taking into account the "presumption" of due care that applies under Georgia law to medical providers.

This case is unlike *Brown.* First, Mr. Armacost did not assert or argue that Dr. Davis had been negligent other than in relation to the standard of care expected of physicians. Second, reference to a "presumption" of due care by medical providers in Georgia case law has been criticized as unduly enhancing a plaintiff's burden. *See* D. B. Dobbs, et al., 1 The Law of Torts (2d ed. 2011) at 543 n.7 (noting the "three-way division of judges" in the

---

[16] The theory of liability based on a comparison to an "ordinarily careful person" related to, among other things, evidence that the defendant physician had made misrepresentations to other health care providers and had failed to take action with respect to a surgical patient who was not breathing. 811 S.E.2d at 364.

precedent relied upon in *Brown* concerning the use of the term "presumption"). Reference to such a "presumption" is disfavored in Maryland in a medical malpractice case because it can only refer to the allocation of the burden of proof and is therefore redundant, with the potential to create jury confusion. *See Riffey v. Tonder*, 36 Md. App. 633, 649-50 (reiterating that trial courts should not refer to such a "presumption" and noting that Judge Moylan had cataloged five potential meanings of the term "presumption" in an earlier case), *cert. denied*, 281 Md. 745 (1977); *see also Brown v. Meda*, 74 Md. App. 331, 342-43, *aff'd*, 318 Md. 418 (1990) (same).

It is neither wrong as a matter of law, nor necessarily misleading, to advise jurors in a negligence case in a general instruction that the tort embodies an objective standard – that the defendant's conduct is to be measured against that of a hypothetical reasonable person in similar circumstances – before making clear that application of that objective standard in the case before the jury requires comparison to a hypothetical reasonable health care provider. Of course, when a trial court recites general principles governing negligence cases as a prelude to focusing on the particular standard of care applicable to the matter to be determined by the jury, it would be useful (and perhaps in some cases necessary) to be explicit that the preface is a preface. Without clarity, the use of a general negligence instruction could create a potential for confusion. We consider whether there was such confusion and a probability of prejudice to Dr. Davis in this case.

*Prejudice*

Even if a trial court gives an erroneous jury instruction, a jury verdict will be reversed only if the complaining party demonstrates a probability of prejudice. In

*Barksdale*, this Court declined to give a specific formula for determining prejudice "given the patchwork of harmless error cases." 419 Md. at 669. It did refer to a list of non-exclusive factors identified by a California court that involve consideration of the evidence presented at trial, the arguments made by the parties, any evidence of actual jury confusion, and the effect of other instructions. *Id.*

In this case, the probability of prejudice appears close to nil. First, in the context of the evidence presented, counsels' arguments, and the jury instructions taken as a whole, there appears to be little possibility that the jury believed it was to assess Dr. Davis' conduct against a hypothetical "reasonable lay person" instead of a hypothetical "reasonable physician." No one at trial suggested that Dr. Davis' conduct was to be measured against that of a reasonable lay person. In presenting expert witnesses on behalf of the plaintiff, counsel for Mr. Armacost elicited testimony that the pertinent standard of care was "a reasonably prudent physician … under similar or like circumstances." Counsel for Dr. Davis elicited similar testimony from his experts that explicitly related the standard of care to that pertaining to neurosurgeons. In eliciting opinions from those witnesses about whether Dr. Davis had (or had not) complied with the standard of care, counsel for all parties repeatedly prefaced their questions with the phrase "to a reasonable degree of medical certainty" or "to a reasonable degree of medical probability."[17] None of counsels'

_____

[17] By our count, counsel for Mr. Armacost prefaced questions with such a phrase at least 27 times, counsel for Dr. Davis used such a phrase at least 17 times, and counsel for GBMC did so at least seven times. On occasion, the witnesses repeated the standard in their answers. No witness advocated for any different standard of care and nothing in the

26

questions – nor any witness' answers – suggested that a lay person standard applied. Likewise, neither party suggested a different standard either in opening statement or closing argument.[18] Perhaps unsurprisingly, Dr. Davis expressed no objection to the general negligence instruction (as opposed to the foreseeability instruction). The jury never expressed any confusion on the subject in the various notes it sent to the court.

Second, to the extent that the jury could have somehow believed that a reasonable lay person standard applied, that standard is less demanding of a professional like Dr. Davis than the "reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances" standard. *See, e.g.,* R.J. Gilbert & P.T. Gilbert,

presentation of evidence suggested that the jury was to compare Dr. Davis' conduct to anyone other than the putative reasonable physician in similar circumstances.

While the phrases "reasonable degree of medical certainty" and "reasonable degree of medical probability" are commonly used to elicit expert medical testimony, their precise meanings apparently elude many judges and litigators. *See* Jeff L. Lewin, *The Genesis and Evolution of Legal Uncertainty About "Reasonable Medical Certainty,"* 57 Md. L. Rev. 380, 400-6 (1998). This Court has stated that the phrase "reasonable degree of medical probability" is used to signify that an expert opinion is based on more than conjecture or speculation. *Kearney v. Berger*, 416 Md. 628, 651-53 (2010). In any event, in this case, both parties first elicited the benchmark standard of care as that of a reasonable medical practitioner. The subsequent repetition of a phrase like "reasonable medical probability" during the testimony of the key witnesses emphasized that the jury was to view reasonableness through the lens of a medical practitioner.

[18] Dr. Davis suggested in his brief that counsel for Mr. Armacost had invited the jury to apply a reasonable lay person standard rather than a reasonable physician standard when she told the jury that, if they were frustrated by the disparate opinions given by the experts presented by the parties, they could look to the measures taken by other physicians who subsequently treated Mr. Armacost. Without opining on the merits of that argument, we note that counsel was simply inviting the jury to also compare Dr. Davis' actions with those of other *physicians* who had treated the same patient in determining whether Dr. Davis had breached the standard of care.

Maryland Tort Law Handbook (3rd ed. 2000) at 109 ("A surgeon performing an operation must exercise a higher degree of care … because the surgeon is engaged in a learned profession for which he/she has been extensively trained[.]"); P.M. Sandler & J.K. Archibald, Pleading Causes of Action in Maryland (6th ed. 2018) at 267 ("The standard [of care] is higher than ordinary care for common carriers and professionals who hold themselves out to the community as having special skills."); Restatement (Second) of Torts, §289, *comment m*, illustrations 12 & 14 (providing examples of circumstances in which a physician or surgeon would be found negligent but a lay person would not be found negligent); *Cromer v. Children's Hospital Medical Center*, 29 N.E.3d 921, 929 (Ohio 2015) (referring to "augmented expectation" with respect to the "heightened" standard of care owed by physician to patient); *Beach v. Lipham*, 578 S.E.2d 402, 406 (Ga. 2003) (observing that physicians, "like other professionals, are held to a higher standard of care"); *Burns v. Metz*, 513 N.W.2d at 508 (referring to the "higher standard of care" applicable to a physician). As a skilled professional, Dr. Davis could only benefit from application of the lesser standard of a reasonable lay person.

In arguing that he was prejudiced by the jury instructions in this case, Dr. Davis cites several cases from other states. Only one of those cases was a medical malpractice case, but it hardly supports Dr. Davis' argument on prejudice. *Stevens v. Duxbury*, 634 P.2d 1212 (Nev. 1981). In *Stevens,* the survivors of a deceased patient brought a wrongful death action against a specialist physician who had treated the patient. The trial court instructed the jury on the standard of care applicable to a general practitioner rather than the higher standard (under Nevada law) applicable to a specialist. Following a defense

28

verdict, the plaintiffs appealed and the appellate court reversed the judgment in favor of the defendant. The court noted that there was no dispute that a higher standard of care applied to the defendant and that questions asked by defense counsel at trial had also incorrectly suggested that the lower standard of care applied. In those circumstances, the court held, the refusal to give the instruction as to the higher standard of care could not be harmless error, given that the defendant had prevailed at trial. 634 P.2d at 1214.

This case presents quite the opposite situation. Dr. Davis posits that the jury may have applied a "reasonable lay person" standard (even though the trial court specifically instructed them as to the standard applicable to physicians like Dr. Davis) – a lower standard of care. If so, it could only have redounded to Dr. Davis' benefit, not to his detriment, as it would be less demanding of a defendant than the professional standard of care. *Stevens* does not support a finding of prejudice in this case. The other out-of-state cases cited by Dr. Davis are distinguishable for similar reasons.[19]

---

[19] In most of those cases, there was no question that the trial court had stated the wrong standard of care in its instructions. Those cases involved situations in which the appellate court found (1) that a *plaintiff* was prejudiced when the jury instruction stated a *lower standard* of care required of the defendant than applicable or (2) that a *defendant* was prejudiced when the jury instructions stated a *higher standard* of care than was applicable to the defendant. *See Wood v. Groh*, 7 P.3d 1163, 1169-70 (Kan. 2000) (overturning verdict favorable to defendant gun owner because trial court refused to give instruction as to higher standard of care applicable to gun owner); *Kuper v. Lincoln-Union Elec. Co.*, 557 N.W.2d 748, 756 (S.D. 1996) (reversing judgment favorable to plaintiff and holding that defendant electric cooperative was prejudiced by jury instruction incorrectly stating that it was required to meet a higher standard of care); *Lindstrom v. Yellow Tax Co.*, 214 N.W.2d 672, 676-77 (Minn. 1974) (affirming trial court's decision to grant plaintiff new trial following defense verdict when trial court decided that plaintiff had been prejudiced by several instructions stating lower standard of care as to defendant common carrier, which was subject to a higher standard of care under state law). By contrast, in this case, the defendant (Dr. Davis) is claiming that he was prejudiced because the trial court

2.     Inclusion of the Foreseeability Instruction

Although the foreseeability instruction (MPJI-Cv 19:3) was the focus of Dr. Davis' objection at trial, it has taken a back seat on appeal. Before us, the parties have primarily focused on the trial court's use of the general negligence instruction (MPJI-Cv 19:1), particularly its reference to a "reasonable person," and its relationship to the negligence count of the complaint. However, as noted earlier, at trial Dr. Davis focused his objection on the pattern foreseeability instruction (MPJI-Cv 19:3) and its relationship to the informed consent count of the complaint – a count on which the jury eventually returned a verdict in his favor. We briefly turn to that instruction.

Dr. Davis now argues that the court's particularized instruction concerning health care providers already incorporated risks – *i.e.*, foreseeable dangers – and that the general foreseeability instruction was unnecessary. Conceding that no Maryland decision has forbidden the use of such an instruction in a malpractice case, he relies primarily on an

---

gave a general negligence instruction more favorable to him in addition to its instruction concerning the higher standard of care required of physicians.

In another case cited by Dr. Davis, the appellate court held that a plaintiff was prejudiced by an incorrect instruction that inexplicably *precluded* a finding of liability if the jury found that the defendant physician had committed malpractice. *Hathaway v. Coughlin*, 99 F.3d 550 (2d Cir. 1996) (in federal civil rights action, trial court instructed jury that it could not find that defendant prison physician was "deliberately indifferent" if it found that he had committed medical malpractice). That case is inapposite.

Here, Dr. Davis, a defendant, is claiming that he was prejudiced because the jury instructions allegedly stated a lower standard of care for his conduct. None of the cases above involved such a claim.

30

Ohio decision to argue that the trial court's use of that instruction was an abuse of discretion. *Cromer v. Children's Hospital Medical Center*, 29 N.E.3d 921 (Ohio 2015).

In *Cromer*, the Ohio Supreme Court considered whether foreseeability of a risk must *always* be considered in determining the duty of a medical professional or whether it may *never* be considered. The court answered "neither." 29 N.E.3d at 924-25. At the trial in that malpractice case, the defendant hospital had asked the trial court to give a general foreseeability instruction, which the trial court did over the plaintiffs' objection. The jury returned a verdict in favor of the hospital and the plaintiffs appealed, arguing, among other things, that giving the general foreseeability instruction was reversible error. The Ohio intermediate appellate court reversed on the basis of the foreseeability instruction.

The Ohio Supreme Court reversed the decision of the intermediate appellate court, holding that "[t]he concept of foreseeability is an important part of *all* negligence claims" and that it relates to the scope of a physician's duty. *Id.* at 928-30 (emphasis added). On the other hand, the court noted that the foreseeability of a particular risk is generally not in dispute in most medical malpractice cases, including the case that was before it, and was therefore "unnecessary" in that instance. *Id.* at 930-31. In dicta, the court stated that it would be "preferable" for the Ohio standard instructions to include a foreseeability instruction specific to a "reasonable medical professional." *Id.* at 933. In any event, it held that, on the facts of the case before it, the "superfluous" instruction on foreseeability was not prejudicial error. *Id.* at 925.

Likewise, even if one regarded the foreseeability instruction in this case as unnecessary or superfluous, no evident prejudice flowed from that instruction. The

potential prejudice identified by Dr. Davis at trial – confusion as to the informed consent count – did not materialize (or at least not to his detriment), as he prevailed on that count. His revised argument concerning prejudice on appeal is simply a reprise of the argument concerning the general negligence instruction which we have rejected in the previous section of this opinion.

3.      Summary

In the taxonomy of civil actions, a medical malpractice action is a species of negligence action.  Unsurprisingly, the general principles governing negligence actions apply.  A trial court does not err in stating those general principles, but should take care to ensure that the jury is focused on how those principles apply in the particular case before it.  Thus, in a case against a health care provider, the trial court should include an instruction that particularizes the benchmark of a reasonable person in similar circumstances to a reasonably competent health care provider acting in the same or similar circumstances, as the trial court did in this case.  Ideally, the court should make clear how the general standard is customized.  Although the trial court in this case might have used transitional sentences or phrases to clarify the relationship of the instructions, in light of the record as a whole (including the instructions, presentation of evidence, and arguments), there appears little possibility that the jury was misled as to the appropriate standard of care.  Moreover, even if the jury had somehow believed that it was to compare Dr. Davis' conduct to that of a reasonable lay person, as opposed to the higher standard of care required of a physician, it would not have been to the detriment of Dr. Davis.  Accordingly, he has not demonstrated the probability of prejudice required to reverse the jury's verdict.

*C.* *The Modified Allen Charge*

As outlined earlier, well into the third day of its deliberations, the jury sent the trial court a note that raised the possibility that it would not reach a verdict. As part of its response to that note, the court gave a modified Allen charge to the jury. The court also informed the jury that it would be required to deliberate only another hour that day and would not be asked to return the next day. Dr. Davis argues that (1) giving the modified Allen charge was an abuse of the trial court's discretion, and (2) "[p]utting a one hour deadline on deliberations" exacerbated that error and was "unduly coercive."

With respect to his first argument, Dr. Davis asserts that the jury had not explicitly stated that it was deadlocked, but had merely asked about the consequences if it failed to reach a verdict. However, there is no requirement that a jury pronounce itself to be deadlocked as a prerequisite to a court giving a modified Allen charge. As this Court has explained, an instruction similar to a modified Allen charge may appropriately be given even before jury deliberations begin, as well as when a jury appears to be deadlocked. *Butler v. State*, 392 Md. 169, 185 (2006). In any event, it was not unreasonable to conclude that the jury in this case appeared to be deadlocked. Jury deliberations had taken place over three days – nearly as long as the presentation of evidence. The jury had told the court that it was "undecided" at the end of the second day of deliberations and, late in the third day, asked what would happen if it was unable to reach a verdict. Counsel for Dr. Davis certainly seemed to think a hung jury was imminent. He told the court that he planned to ask for a mistrial – the consequence of a hung jury – if the jury did not return a verdict by the end of that day.

The modified Allen charge in this case was given only after three days of deliberation, the content of the instruction favored neither party, and the trial court explicitly told the jurors "not [to] surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict." We agree with the Court of Special Appeals that the trial court acted within its discretion when it decided to give a modified Allen charge.

The remaining question is whether the trial court abused its discretion when it also informed the jurors as to how long it planned to require them to deliberate. Dr. Davis observes that the jury returned its verdict later that afternoon and infers that the modified Allen charge, together with the advice that the court would not require deliberations beyond that day, must have coerced the jury to reach a verdict. However, the fact that a jury comes to a consensus shortly after hearing a modified Allen charge does not mean that the instruction was coercive. That inference has been rejected by many courts in a variety of contexts. *See, e.g.*, *United States v. Arney*, 248 F.3d 984, 990 (10th Cir. 2001) (verdict reached an hour after a modified Allen charge given); *Green v. French*, 143 F.3d 865, 886 (4th Cir. 1998) (verdict returned one hour after Allen charge); *United States v. Hernandez*, 105 F.3d 1330, 1334 (9th Cir. 1997) (verdict returned 40 minutes after Allen charge); *United States v. Smith*, 635 F.2d 716, 721-22 (8th Cir. 1980) (verdict returned 45 minutes after Allen charge).

Whether informing a jury as to when its deliberations will end is unduly coercive, as Dr. Davis now contends in this case it was, depends on the circumstances of the case. Context is key. In situations where a trial judge essentially places a deadline on the jury,

34

coupling that deadline with a modified Allen charge can be reversible error. For example, in *Burroughs v. United States*, 365 F.2d 431, 434 (10th Cir. 1966), before deliberations had even begun, the trial court asked the jury to reach a verdict within the hour and, when the jury had not returned a verdict within that hour, followed up with an Allen charge. The Tenth Circuit held that, "considered in their context," the trial judge's actions suggested that he was "unduly anxious" to conclude the trial and went "beyond the permissible limits" of an Allen charge. *See also United States v. Amaya*, 509 F.2d 8 (5th Cir. 1975), *cert. denied*, 429 U.S. 1101 (1977) (giving an unmodified standard Allen charge that emphasized the expense of the trial, suggesting that the court might continue jury deliberations for nine days, and then asking the jury to report back an hour after it began deliberations were "nuances" that were beyond "allowable perimeters" of an Allen charge).[20]

---

[20] In arguing that the trial court imposed a coercive deadline on the jury in this case, Dr. Davis relies on several other cases bearing little resemblance to this case. *See Lucas v. American Mfg. Co.*, 630 F.2d 291 (5th Cir. 1980) (jury reached apparent compromise verdict inconsistent with the evidence after the judge instructed it to reach a verdict within 15 minutes that day or be required to return at a later date); *Allen v. People*, 660 P.2d 896 (Colo. 1983) (espousing a "case-by-case examination of the particular facts of each case" and reversing a verdict when the trial court gave the jury a time limit for reaching its verdict and did *not* give an approved version of the modified Allen charge); *Goff v. United States*, 446 F.2d 623 (10th Cir. 1971) (on morning of second day of jury deliberations, trial court gave modified Allen charge with "time fuse" instruction to reach a verdict within one hour, which defense counsel specifically objected to); *State v. Mason*, 588 S.W.2d 731, 734 (Mo. Ct. App. 1979) (reversing conviction in case where trial court gave an Allen charge and the transcript of court's colloquy with foreman "clearly indicates the foreman understood that the court was requiring that the case be decided" within a 15-minute deadline).

However, a trial judge's decision to keep a jury informed about the timetable of the trial does not necessarily convert an appropriate Allen charge into an unduly coercive one. *See United States v. Arney*, 248 F.3d at 990 (considering "overall context" in which modified Allen charge was given and rejecting argument that the Allen charge, in conjunction with "timing factors," coerced jury's verdict); *cf. Green v. French*, 143 F.3d 865, 886-87 (4th Cir. 1998) ("when read in context," modified Allen charge did not coerce jury into reaching a decision "simply to end a grueling marathon session of jury duty").

Considered in context, the statement of the trial court concerning the jury's schedule was not coercive. The court informed the jury that it would not be required to continue its deliberations at the end of the seventh day of a trial that the court and counsel had previously and repeatedly told the jury would last no longer than seven days. At least three of the jurors had expressed some concerns related to the length of the trial and one juror had already been excused. Deliberations had already taken place over three days and, toward the end of each of the two prior days, the jury had sent notes concerning when deliberations would conclude on each of those days. Indeed, a juror had already sent a note on the third day expressing a concern about child care.

In that context, advising the jury as to its schedule was respectful of the jury's time and of external concerns that might distract jurors from their responsibility to deliberate.[21]

---

[21] At oral argument in this Court, counsel for Dr. Davis suggested – for the first time – that the jurors might have felt pressured to reach a verdict because they might have believed that they would be required to sit through a second trial of the case if they did not reach a verdict. There is no basis in the record for such speculation. Indeed, the notion that a jury that is unable to reach consensus in a case would be required to sit through the same evidence again appears to equate the judicial system with the mythical gods who

In objecting to the modified Allen charge, counsel for Dr. Davis did not object to allowing the jury one more hour of deliberations – indeed, he indicated that he hoped to end the jury's deliberations that day by filing a motion for a mistrial. Leaving the jury in the dark as to the court's intentions would likely have raised concerns among the jurors as to when, if ever, they would emerge from the jury room. Ironically, in that situation, jurors concerned about child care or other personal scheduling issues might have felt coerced to surrender sincerely held views simply to be released from jury service. As the trial court observed, failing to respond as it had suggested would be to "[j]ust let them sit in there and stew." *See Amaya*, 509 F.2d at 12 (trial court's instruction that it might require jurors to continue deliberating for up to nine days may have coerced a verdict through the "bleak prospect promised by continued indecision").

The trial court's decision to keep the jury apprised of the schedule in this case was consistent with the best practices for managing a jury. *See* American Bar Association, *Principles for Juries and Jury Trials* (2005), available at https://www.americanbar.org /content/dam/aba/administrative/american_jury/principles.pdf [https://perma.cc/Z95T-G8MS], at 4-5 (trial court "should respect jurors' time" in various ways), 17 ("Jurors should be informed of the trial schedule and of any necessary changes to the trial schedule

---

condemned Sisyphus to the eternal punishment of having to repeatedly roll a stone up a hill only to have it roll back down. In any event, such speculation would be contrary to the information that the Circuit Court routinely provides prospective jurors that jury service consists of one day or, if the individual is seated on a jury, one trial. Circuit Court for Baltimore County, Jury Service – Frequently Asked Questions, available at https://www.baltimorecountymd.gov/Agencies/circuit/jury_duty_faq/service_faq.html [https://perma.cc/LUW8-BEEM].

at the earliest practicable time"), 22 ("the court should not require or threaten to require the jury to deliberate for an unreasonable length of time").

Finally, it is notable that, in informing the jury of the court's schedule, the trial judge did not insist upon a verdict: "So I'm going to ask that you deliberate another hour. I know that you have been at it pretty hard .... And we will see if you can reach a verdict today .... I'm not going to ask you to return tomorrow, but I do want you to try again."

In our view, in the context of this case, the trial court's decision to advise the jury of its schedule did not render the modified Allen charge coercive and was not an abuse of discretion.

### III

### Conclusion

For the reasons explained above, we hold:

(1) The trial court did not abuse its discretion when it gave standard general instructions on negligence and foreseeability in addition to an instruction particularizing the relevant standard of care in a medical malpractice case. While the instructions might have been phrased better to highlight the relationship between the prefatory general negligence instructions and the instruction on the standard of care applicable to a health care provider, the instructions were not misleading when considered as a whole. Nor was there a showing of the probable prejudice required to overturn a jury verdict.

(2) The trial court acted within its discretion when it gave the jury a modified Allen charge toward the end of the third day of jury deliberations after the jury had sent a note suggesting that it might be deadlocked. In the particular circumstances of this case, the

38

court also acted within its discretion when it informed the jury that it would only be required to continue its deliberations for another hour.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

Circuit Court for Baltimore County
Case No. 03-C-14-011973
Argued: October 9, 2018

IN THE COURT OF APPEALS
OF MARYLAND

No. 69

September Term, 2017

_____

MARK ARMACOST

v.

REGINALD J. DAVIS

_____

Barbera, C.J.,
Greene,
*Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Concurring and Dissenting Opinion by
Hotten, J., which Getty, J., joins

_____

Filed: January 25, 2019

*Adkins, J., now retired, participated in
the hearing and conference of this case
while an active member of this Court;
after being recalled pursuant to Maryland
Constitution, Article IV, Section 3A, she
also participated in the decision and
adoption of this opinion.

I respectfully concur with and dissent from the majority opinion. I agree with the majority's position that the trial court's instructions on the applicable law did not mislead the jury and did not prejudice the jury against Dr. Davis. I further agree with the majority that the trial court did not abuse its discretion by giving a modified Allen charge after two and a half days of deliberation. However, I disagree with the majority's conclusion that the trial court's attachment of a one-hour time limit to the modified Allen charge did not unduly coerce an admittedly undecided jury into reaching a unanimous verdict.

*The Standard-of-Care Jury Instructions Were Proper and Did Not Mislead the Jury.*

The trial court gave the jury a number of jury instructions prior to deliberation. Relevant to this appeal, the trial court recited the Maryland Civil Pattern Jury Instructions (MPJI-Cv) 19:1, 19:3, and 27:1.[1] The MPJI-Cv, as well as its criminal counterpart, the Maryland Criminal Pattern Jury Instructions (MPJI-Cr), provides trial courts with unambiguous and consistent instructions for informing jurors of the relevant law applicable in the case before them. This Court has advocated for the close adherence to these "approved pattern instruction[s]" in a variety of cases, exhibiting our general support for their use. *See Ruffin v. State*, 394 Md. 355, 357, 906 A.2d 360, 361-62 (2006) (holding that a "trial court must closely adhere to the approved pattern instruction on the

---

[1] MPJI-Cv 19:1 defines "negligence" and sets forth the general standard of care for a reasonable person. MPJI-Cv 19:3 defines "foreseeable circumstances." MPJI-Cv 27:1 defines the specific standard of care applied to healthcare providers in medical negligence suits. All references to the MPJI-Cv refer to the fourth edition, as that was the most recently published edition at the time of the trial. The fifth edition, published in 2018, provides no substantive changes to the instructions referenced above. However, the fifth edition does renumber MPJI-Cv 27:1 as MPJI-Cv 27:2.

presumption of innocence and reasonable doubt[]"); *see also Thompson v. State*, 371 Md. 473, 485, 810 A.2d 435, 442-43 (2002) (remanding the case for a new trial because the jury instructions given by the trial court involved "substantial deviations" from the Maryland pattern jury instructions).

The trial court's reading of the general negligence and foreseeability jury instructions, MPJI-Cv 19:1 and 19:3 respectively, were not improper or misleading. First, the trial court did not misstate or deviate from the language in the MPJI-Cv, as was the case in *Thompson*. Rather, the trial court read 19:1 and 19:3 verbatim, with no additional or substituted language. As expressed above, there exists general approval, and even a preference, for the unedited use of pattern jury instructions in both civil and criminal cases. There has been no convincing reason proffered to veer from this preference now. Second, the actual utilization of these general negligence instructions was not improper because "[t]he general principles which ordinarily govern negligence cases also apply in medical malpractice claims." *Shilkret v. Annapolis Emergency Hosp. Ass'n*, 276 Md. 187, 190, 349 A.2d 245, 247 (1975). Because medical negligence is a subset of negligence tort law, instructions explaining the general principles of tort law is not improper. Furthermore, the general instructions were not misleading because the trial court went on to specify the particular standard of care applicable in this case by reciting MPJI-Cv 27:1. This instruction, as it appears in the fourth edition, was recited verbatim. MPJI-Cv 27:1 served to clarify that the jury was to analyze the case in light of the standard of care applicable to healthcare professionals in medical negligence cases. The trial court's jury instructions

2

were not improper because they outlined the general principles guiding negligence cases, and then further explained what standard would apply in the present case.

Even if the use of these instructions was improper, I agree with the majority's determination that they did not demonstrate a probability of prejudice against Dr. Davis. As the majority notes, Dr. Davis's status as a medical professional was referenced countless times throughout the trial. Even without these references, the verbatim recital of MPJI-Cv 27:1 clearly portrays the relevant standard of care applicable in the present case. Furthermore, the majority aptly pointed out that even if the jury applied the reasonable person standard in MPJI-Cv 19:1, it would in fact benefit Dr. Davis because the reasonable person standard is less demanding than the heightened "reasonably competent healthcare provider" standard applicable to a healthcare practitioner. If anything, application of a reasonable person standard would serve to prejudice Mr. Armacost, not Dr. Davis. *Cf. Stevens v. Duxbury*, 97 Nev. 517, 634 P.2d 1212 (1981) (concluding that a trial court's failure to instruct the jury as to the higher standard of care applied to medical specialists was prejudicial to the plaintiff).

For these reasons, I concur with the majority's conclusion that the trial court was neither wrong as a matter of law, nor was it misleading or prejudicial, to provide general instructions regarding the objective standards of negligence and foreseeability in tort cases, and then make clear that the jury was to apply the specific standard of care relevant in medical negligence suits.

*The Trial Court Abused its Discretion by Attaching a One-Hour Time Limit to the Modified Allen Charge.*

3

I respectfully diverge from the majority opinion with regard to the trial court's implementation of a one-hour deadline after administering a modified Allen charge. To be clear, the trial court did not abuse its discretion when it gave a modified Allen charge to the jury. In general, the charge may be given "only when the jury appears to have encountered difficulties in reaching unanimity." *Orthopedic Equip. Co. v. Eutsler*, 276 F.2d 455, 463 (4th Cir. 1960). At the time the charge was given, the jury had been deliberating for over two days. Additionally, notes to the trial court from the jury indicated a possible inability to reach a unanimous verdict. The first note informed the trial court that the jury was "undecided" at the end of the second day of deliberations, and a second note asked the trial court what would happen if the jury was unable to reach a verdict. Given the length of deliberation and the multiple indications that the jury was having difficulty reaching a verdict, it was not an abuse of discretion to give a modified Allen charge.

However, in giving the Allen charge, the trial court deviated from what we have identified as the proper modified Allen charge language by including a one-hour deadline for further jury deliberation. *See Burnette v. State*, 280 Md. 88, 96, 371 A.2d 663, 667 (1977) (referencing with approval the modified Allen charge language set forth but the American Bar Association ("ABA")). We have explained that a trial court "should closely adhere to the wording of the ABA recommended instruction[]" when giving an Allen charge. *Kelly v. State*, 270 Md. 139, 144, 310 A.2d 538, 542 (1973). Judicial deviation from this approved modified Allen charge language is subject to "careful scrutiny in order

4

for it to be determined whether the province of the jury has been invaded and the verdict unduly coerced." *Id.*

After the trial court here gave the jury a modified Allen charge, using language from the ABA, the court stated, "So I'm going to ask you to deliberate another hour . . . . And we will see if you can reach a verdict today . . . . I'm not going to ask you to return tomorrow, but I do want you to try again." Majority Slip Op. at 14. The majority contends that "a trial judge's decision to keep a jury informed about the timetable of the trial does not necessarily convert an appropriate Allen charge into an unduly coercive one." Majority Slip Op. at 36. While I agree with this statement generally, I disagree with categorizing the trial court's one-hour deadline as merely keeping the jury "informed about the timetable of the trial." The trial court did not, at the outset of the trial or prior to the beginning of deliberations, inform the jury that it would have a set amount of time to deliberate. Nor did the trial court give the jury one more hour to deliberate before sending the jurors home for the day, but explained that they would have return the next morning. Rather, the trial court gave the jury a firm deadline as to when deliberations would definitively end. It is important to consider the context in which the timetable is being given. A trial judge certainly has the ability to keep the jury informed of their time commitment. However, the trial judge may not use that information in a manner that coerces the jury into reaching a verdict prematurely.

Had the trial court *either* given a modified Allen charge *or* informed them of the length of time they were expected to continue to deliberate, the impact may be different. *See United States v. Arney*, 248 F.3d 984, 990 (10th Cir. 2001) (upholding a verdict reached

5

one hour after an Allen charge was given); *United States v. Hernandez-Albino*, 177 F.3d 33, 39 (1st Cir. 1999) (same); *Munroe v. United States*, 424 F.2d 243, 245-46 (10th Cir. 1970) (upholding a verdict reached forty minutes after an Allen charge was given); *Lang v. State*, 6 Md. App. 128, 133, 250 A.2d 276, 279 (1969) (upholding a verdict reached seven minutes after an Allen charge was given).  However, these instructions "[were] not given in isolation[.]"  *Davis v. Armacost*, 234 Md. App. 71, 101, 168 A.3d 1112, 1128 (2017).  Rather, the jurors were first encouraged "to re-examine [their] own views and change [their] opinions if [they were] convinced it [was] erroneous."  Immediately following this guidance, the trial court informed the jury that they would only have one additional hour for this re-examination and continued deliberation.

In *Burroughs v. United States*, the trial court gave a jury a modified-Allen charge after having deliberated for less than 90 minutes.  365 F.2d 431, 433-34 (10th Cir. 1966).  Included in the Allen charge was an instruction that the jury would only be required to stay until 7:00PM (35 more minutes).  *Id.* at 434.  If the jury was unable to reach a verdict by that time, the judge explained that

> it would be the opinion of the court because of the importance of the case, because of the expense incurred, because of the expense yet to be incurred should [the jury] not get together, to probably recess the matter until the morning and then let [the jury] go back to deliberations.

*Id.*  The Tenth Circuit explained that it is proper to instruct the jury to deliberate further, to inform them that they may be excused until the next day of deliberations, or to encourage them to respectfully consider their views and the other jurors' views in order to reach a decision.  *Id.*  However, the court distinguished these permissible instructions with those

6

that "entreat [the jury] to strive toward a verdict by a certain time." *Id.* The Tenth Circuit concluded that the charge given by the trial court "went beyond the permissible limits of the Allen charge[.]" *Id.* The instructions given in the case at bar are even more coercive than those in *Burroughs* considering that the instructions in *Burroughs* still required the jury to return the next day for further deliberation if the jurors had yet to reach a verdict. Conversely, the trial court here gave a definitive time limit for the entirety of deliberations, without providing an opportunity for further deliberation after the one-hour deadline.

The context in which the instructions in the present case were given further supports the conclusion that they were unduly coercive to the jury in reaching a verdict. From the beginning and throughout the trial, the trial court reassured the jury that the trial would last no longer than seven days. The court even made efforts during the trial to urge efficient use of time, chastising counsel for wasting time by litigating motions after the jurors had already arrived that day for trial. One juror was excused on the third day of the trial because the length of the trial conflicted with his ability to care for an elderly relative. The remaining jurors raised concerns regarding the length of the trial from its outset, throughout the trial and during deliberations. It is clear that the jury, as well as the trial court, was concerned about the length of the trial and anxious to conclude the lawsuit. Given this knowledge, the trial court had a duty to be particularly careful in giving additional instructions, such as a timetable for deliberations or a modified Allen charge, so as not to urge the jury to reach a conclusion not guided by its genuine and honest opinions.

After over two and a half days of deliberating, the jury had yet to come to a unanimous verdict. The multiple notes sent to the trial court evidence the jury's genuine

7

concern of not reaching a verdict in the near future. The fact that the jury then reached a unanimous verdict after being given an Allen charge and an impending, one-hour deadline is, at its very best, suspect. *See Lowenfield v. Phelps*, 484 U.S. 231, 232, 108 S. Ct. 546, 548 (1988) "[C]oercion is suggested by the fact that the jury returned its verdict soon after receiving the supplemental instruction[.]"). "[V]erdict-urging on the part of the court tends to undermine the proper function of the common law jury system . . . ." *Burroughs v. United States*, 365 F.2d 431, 434 (10th Cir. 1966). Accordingly, the trial court's imposition of a one-hour deliberation deadline to a modified Allen charge, with full knowledge of the jury's concern over the length of the trial and deliberations, was unduly coercive and prejudicial to the administration of justice. Given the prejudicial nature of this error, I dissent from the majority opinion and would affirm the Court of Special Appeals on this issue.

For the above reasons, I respectfully concur in part and dissent in part.

Judge Getty has authorized me to state that he joins in this opinion.