*American Radiology Services, LLC, et al. v. Martin Reiss*, No. 50, September Term, 2019, Opinion by Booth, J.


**MEDICAL MALPRACTICE – DEFENSE OF NON-PARTY MEDICAL NEGLIGENCE – REQUIREMENT OF EXPERT TESTIMONY.** To generate a defense of non-party medical negligence, expert testimony is required to establish a breach of the standard of care by the non-party and to establish causation. We have consistently held that, other than an occasional "obvious injury" case, expert testimony is required to establish medical negligence and causation, which is rooted in the notion that such complex issues are beyond the general knowledge and comprehension of layperson jurors. Accordingly, our requirement that medical negligence be established by expert testimony is tied to a party's burden of producing admissible evidence sufficient to generate an issue for the jury. The need for expert testimony is not alleviated because a defendant asserts non-party medical negligence as an alternative causation theory in connection with a general denial of liability. In other words, the subject matter—medical negligence—does not become less complex or fall within a jury's common knowledge simply because it is raised as a defense. We are not holding or requiring that the defendant must call his or her own expert to generate the issue to prove that the non-party physician was the negligent person. Assuming the discovery rules are satisfied, the defendant may elicit expert standard of care testimony through cross-examination of plaintiff's expert, or may call an expert of his or her own, but the defendant is not required to call an expert of his or her own.

In this case, the Defendants' attempt to rely upon the general pronouncements of preferred treatment by the Plaintiff's experts fell short of satisfying the legal standard of establishing to a reasonable degree of medical probability that the non-party physicians' conduct fell below the standard of care and caused the Plaintiff's injury. With no expert testimony to establish medical negligence or causation, the circuit court erred in submitting the question of non-party medical negligence to the jury.

**VERDICT SHEET – ERRONEOUS SUBMISSION OF ISSUE TO JURY – PREJUDICE.** In this case, the erroneous submission on the verdict sheet of the issue of non-party medical negligence was prejudicial. The jurors' confusion is obvious from the face of the aberrant verdict sheet—the jury awarded the Plaintiff $4.8 million in damages, even though they found that the Defendants were not negligent. They purported to award damages solely upon a factual determination that negligence by the non-party physicians caused the plaintiff's injuries. The jury made this factual determination notwithstanding the fact that there was no admissible evidence that any of the non-party physicians breached the standard of care. The jurors could not have reasonably been expected to put that conclusion out of their minds when the circuit court directed them to return to their deliberations and complete a second verdict sheet.

Circuit Court for Baltimore City
Case No.: 24-C-16-002826
Argued: February 6, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 50

September Term, 2019

AMERICAN RADIOLOGY SERVICES, LLC, et al.

v.

MARTIN REISS

McDonald
Watts
Hotten
Getty
Booth
Biran
Raker, Irma S.
  (Senior Judge, Specially Assigned),

JJ.

Opinion by Booth, J.

Filed: August 24, 2020

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Under Maryland law, we require affirmative proof of medical negligence before such a claim can be submitted to a jury. To establish medical negligence, it is necessary to determine whether a physician breached a duty of care, and whether the breach caused the plaintiff's injury. As this Court recognized 130 years ago, "all persons are presumed to have duly performed any duty imposed on them" and therefore "negligence cannot be presumed, but must be affirmatively proved." *State ex rel. Janney v. Housekeeper*, 70 Md. 162 (1889). Moreover, except in rare cases where negligence is obvious and within the common knowledge of a layperson, we require that medical negligence be established by expert testimony.

In this case, we are asked to determine whether expert testimony is required to establish the medical negligence of a non-party physician in a medical malpractice case, where the defendant physicians (the "Defendants") deny liability but assert, as an alternative causation theory, that the negligence of a non-party physician was a cause of the plaintiff's injuries.[1] In other words, where medical negligence is raised as part of a defense, may a jury consider whether a non-party physician was negligent and caused injury to the plaintiff without the expert testimony that is ordinarily required to establish medical negligence?

Under our jurisprudence, expert testimony is required to establish medical negligence and causation when such matters are outside the common knowledge of jurors. To the extent that a defendant elects to raise non-party medical negligence as part of its

---

[1] The trial strategy of assigning blame to an individual who is not a party to the case is often referred to as the "empty chair" defense.

defense, the defendant has the burden to produce admissible evidence to allow a jury to make a finding on that issue. In this case, the trial court erred in allowing the Defendants to raise and argue the issue of non-party negligence and to submit the issue to the jury because the record was devoid of admissible evidence sufficient to generate a triable issue of non-party physician negligence. Therefore, we affirm the judgment of the Court of Special Appeals.

## I.

### Factual and Procedural History

#### A. *Background*

In August 2011, Martin Reiss was diagnosed with a renal tumor in his kidney and an adjacent enlarged lymph node. Julio Davalos, M.D., a urologist, surgically removed Mr. Reiss's cancerous kidney. Dr. Davalos did not remove the enlarged lymph node as he had originally planned because of its proximity to the inferior vena cava, which is "a large blood vessel responsible for transporting deoxygenated blood from the lower extremities and abdomen back to the right atrium of the heart." William D. Tucker & Bracken Burns, *Inferior Vena Cava*, National Center for Biotechnology Information (May 1, 2020), https://perma.cc/CU7C-D77E.

After surgery, Mr. Reiss was treated by Russell DeLuca, M.D., an oncologist. Dr. DeLuca also believed that the enlarged lymph node was cancerous but that it could not be removed safely because of its proximity to the inferior vena cava. Dr. DeLuca treated Mr. Reiss with Sutent, a chemotherapy drug. Mr. Reiss's lymph node shrunk in response to the treatment, confirming that the node was cancerous.

2

Dr. DeLuca treated Mr. Reiss between August 2011 and September 2015.  During this time, he ordered periodic CT scans of the cancerous lymph node and the surrounding area.  Radiologist Victor Bracey, M.D., first interpreted the imaging studies performed on Mr. Reiss in December 2011 and compared them to studies from September 2011. Dr. Bracey noted no signs of "lymphadenopathy" or enlargement of the lymph node, because it measured only .8 centimeters, rather than the previous measurement of 2.4 centimeters. However, Dr. Bracey also noted that because the scan had been performed without IV contrast dye, which enhances the clarity of CT images, it was "suboptimally evaluated," meaning that it was difficult to interpret.

Between 2012 and 2014, Dr. Bracey evaluated three additional scans of Mr. Reiss's lymph node, each time finding no lymphadenopathy, but in each instance he noted that the scans were suboptimally evaluated for lack of contrast dye.  Radiologist Sung Kee Ahn, M.D., also interpreted a non-contrast scan of Mr. Reiss's lymph node in March of 2012. Like Dr. Bracey, she did not report any signs of lymphadenopathy.

In September 2015, radiologist Elizabeth Kim, M.D., interpreted a non-contrast CT scan, and found "soft tissue density" in the vicinity of the lymph node, which could indicate an enlarged or diseased lymph node.  Dr. Kim noted that the "soft tissue density" was "somewhat inseparable from the inferior vena cava" and had "increased in size" since Dr. Bracey's review of the CT scan performed in December 2011.

A biopsy was performed subsequent to Dr. Kim's report, which confirmed that the lymph node was indeed cancerous.  Dr. DeLuca thereafter advised Mr. Reiss that the lymph node was cancerous, had increased in size, and was inoperable.  Mr. Reiss ceased his

3

treatment with Dr. DeLuca, and began treatment with oncologist, Eugene Ahn, M.D.[2]  Dr. Eugene Ahn also believed that the cancerous lymph node could not be surgically removed because of its proximity to the inferior vena cava.

### B. Litigation

In May 2016, Mr. Reiss filed a medical malpractice action against Dr. Davalos and his medical practice, Chesapeake Urology, P.A., as well as Dr. Bracey and Dr. Sung Kee Ahn, and their employer, American Radiologists, LLC.  Mr. Reiss alleged that the cancerous lymph node could (and should) have been removed in 2011 but had become inoperable because of the Defendants' negligence.  Mr. Reiss alleged that Dr. Davalos breached the standard of care by failing to remove the lymph node in 2011 when he removed the cancerous kidney.  He further alleged that Dr. Bracey and Dr. Sung Kee Ahn breached the standard of care by failing to alert his oncologist, Dr. DeLuca, of the alleged growth of the diseased lymph node when it could have been safely removed.

In June 2017, Mr. Reiss voluntarily dismissed his claims against Dr. Davalos and his urology practice prior to trial, leaving Drs. Bracey and Sung Kee Ahn and American Radiology ("the radiologists") as the sole Defendants.

### 1. Expert Designations and Pre-Trial Motions

Prior to trial, the Plaintiff and Defendants each designated expert witnesses.  The radiologists generally denied liability and presented experts who rendered opinions that the radiologists did not breach the standard of care owed to Mr. Reiss, nor did their treatment

---

[2] Because Defendant, Sung Kee Ahn, M.D., and Mr. Reiss's treating oncologist, Eugene Ahn, M.D., have an identical surname, we use their first and last names throughout this opinion.

of Mr. Reiss cause his alleged injuries. In addition to denying liability, the radiologists alleged in their discovery responses that Mr. Reiss's oncologists, Dr. DeLuca and Dr. Eugene Ahn, were negligent and had caused Mr. Reiss's injuries.[3]

Despite their assertions of negligence by the non-party providers, the Defendants did not specifically identify experts to render opinions on these matters. Instead, during discovery, Defendants included a *pro forma* statement advising that they reserved the right to rely on the opinions of Plaintiff's experts.[4]

Plaintiff filed a motion *in limine* to preclude the Defendants from arguing or presenting evidence of non-party negligence by other physicians who treated Mr. Reiss, including eliciting expert testimony from the Plaintiff's experts. The Defendants opposed the motion. Prior to trial, the judge ruled that under *Copsey v. Park*, 453 Md. 141 (2017), and *Martinez ex rel. Fielding v. Johns Hopkins Hospital*, 212 Md. App. 634 (2013), the Defendants would be permitted to mention that the Plaintiff had sued the surgeon, Dr. Davalos, and would be permitted to reference "claims and contentions against parties and non-parties when we're talking about evidence that has evidentiary value." Although the trial judge determined that arguments and evidence of negligence by non-parties were

---

[3] In their discovery responses, the radiologists focused their allegations of non-party negligence on Dr. DeLuca. The radiologists also asserted that the "physicians at the Cancer Treatment Centers of America" (a reference to Dr. Eugene Ahn) failed to refer Plaintiff for a consultation with a vascular surgeon. However, as will be discussed, during the trial, the radiologists expanded their allegations of non-party negligence to include Dr. Davalos.

[4] Specifically, in their expert witness designation, the Defendants stated that they "reserve the right to call any expert identified by any other party herein and reserve the right to rely on the testimony of any expert witness identified by any other party herein."

relevant and admissible under *Martinez* and *Copsey*, she ruled that on cross-examination, the Defendants would not be permitted to elicit opinions from the Plaintiff's expert witnesses concerning negligence of non-party physicians due to a lack of appropriate disclosure.[5]

2. *Trial Testimony*

The case was tried between June 26 and July 7, 2017. At trial, the radiologists contended that they did not breach the standard of care. They argued that their interpretations of Mr. Reiss's non-contrast CT scans were reasonable, appropriate, and within the standard of care. Specifically, they asserted that: (1) the CT scans did not show lymphadenopathy because the lymph node was less than one centimeter in size when they reviewed it; (2) they accurately reported that the lymph node was not abnormally enlarged; and (3) they warned Dr. DeLuca that the non-contrast CT scan was suboptimal, and therefore, more difficult for them to review.

Mr. Reiss called Paul Collier, M.D., an expert vascular surgeon, to establish that the lymph node could have been safely removed at any time before 2015, but not later. Similarly, the radiologists' expert vascular surgeon, Dr. James Black, testified that the lymph node could have been removed in 2011 and disagreed with Dr. Collier's opinion that the lymph node could not have been removed after 2015. Dr. Black testified that at the time of trial in 2017, he could have safely removed Mr. Reiss's lymph node.

---

[5] On appeal, Petitioners have not argued that the trial court erred in prohibiting defense counsel from eliciting opinions from the Plaintiff's experts concerning negligence of non-party physicians. Accordingly, we do not address the propriety of the ruling.

Mr. Reiss also called Barry Singer, M.D., as an expert in oncology. Dr. Singer testified that Mr. Reiss's probability of survival would be far greater if the lymph node had been removed between 2011 and 2014, before it became "presumably unresectable." In Dr. Singer's opinion, the "available treatment realities" for Mr. Reiss's cancerous lymph node would have been to remove the lymph node between 2011 and 2014, because "you always want to remove cancer from the body." Dr. Singer further testified that, to a reasonable degree of medical probability, a biopsy of the lymph node conducted before 2015 would have demonstrated that it was cancerous. In Dr. Singer's opinion, to a reasonable degree of medical probability, had the lymph node been removed between 2011 and 2014, Mr. Reiss more likely than not would have been cured. On cross-examination, Dr. Singer testified that, at the time of Mr. Reiss's original diagnosis in 2011, all of Mr. Reiss's doctors knew that the lymph node was probably cancerous and that a reasonable oncologist would have known that the node probably contained cancer.

Mr. Reiss also called Dr. DeLuca, his treating oncologist between August 2011 and September 2015, as a fact witness, to establish that Dr. Bracey's and Dr. Sung Kee Ahn's radiological reports led him to believe that the cancer in Mr. Reiss's lymph node was in remission. Because he believed the cancer was in remission, Dr. DeLuca testified that he discontinued chemotherapy and simply monitored Mr. Reiss's condition. When asked why he did not order a biopsy of the lymph node when it was smaller, Dr. DeLuca responded with a question: "What was I going to biopsy?" Dr. DeLuca testified that, hypothetically, had he been informed that the lymph node was increasing in size, he would have offered

7

some "alternative treatment," such as another chemotherapy drug, and would have consulted a surgeon.

On cross-examination, Dr. DeLuca testified that after Mr. Reiss's surgery in 2011, he assumed that the lymph node contained cancer because it was enlarged. When the lymph node shrunk in response to the administration of Sutent, Dr. DeLuca stated that he was "confident" that the node contained cancer and conceded that Sutent does not cure cancer. Dr. DeLuca also admitted that he did not refer Mr. Reiss's case to the tumor board of medical professionals to discuss whether surgery was an option. On both direct and cross-examination, Dr. DeLuca said that based on what Dr. Davalos told him, he was under the impression that the lymph node was not resectable.

Dr. DeLuca also testified on cross-examination about his decision to order scans without IV contrast in order to avoid potential toxicity to Mr. Reiss's remaining kidney. Dr. DeLuca acknowledged that it is more difficult to assess a CT scan without IV contrast dye than with IV contrast dye.

During the trial, the jury received testimony of several other physicians, including the deposition testimony of Dr. Eugene Ahn, Mr. Reiss's treating oncologist. In response to questioning, Dr. Eugene Ahn testified that, when he began treating Mr. Reiss in October 2015, he prescribed Opidivo to treat renal cell carcinoma, but did not refer him for surgery for the lymph node. Dr. Eugene Ahn explained that his colleague, a general surgeon, had informed him that surgery would not be in Mr. Reiss's best interest, because there was no discernible plane of denotation between the lymph node and the inferior vena cava. The general surgeon explained that, in his judgment, the risk of surgery was too high in relation

8

to any expected improvement in Mr. Reiss's overall likelihood of survival. In response to questions by counsel for the radiologists, Dr. Eugene Ahn admitted that he never consulted with a vascular surgeon, nor did he advise Mr. Reiss to consult with a vascular surgeon.

During the trial, no expert witness testified, to a reasonable degree of medical probability, that the standard of care required the urologist, Dr. Davalos, to remove the enlarged lymph node when he removed Mr. Reiss's cancerous kidney in 2011. Nor did any expert witness testify that, to a reasonable degree of medical probability, the standard of care required the oncologists, Dr. DeLuca and Dr. Eugene Ahn, to refer Mr. Reiss to a surgeon to remove the potentially cancerous lymph node or to order a biopsy of the lymph node. With respect to the non-party physicians, the radiologists did not call any expert witnesses to render opinions related to the standard of care, or that any breach in the standard of care by the non-party physicians caused injury to Mr. Reiss. On cross-examination, when defense counsel attempted to elicit opinions from the Plaintiff's expert, Dr. Collier, concerning whether Dr. Davalos breached the standard of care, the trial court sustained the Plaintiff's objection to the line of questioning, consistent with her rulings on the motions *in limine*.[6]

---

[6] In response to Plaintiff's counsel's objection to defense counsel's cross-examination of Dr. Collier, the trial court stated that it was not permitting defense counsel to elicit standard of care testimony from the Plaintiff's expert witnesses, explaining that under the court's previous rulings on the motions *in limine* that

> I addressed on the record what I contemplated in terms of *Copsey* and *Martinez*, and my concern about the absence of a [Maryland Rule 2-]402(g) designation. What I did say is that the facts and circumstances of negligence by a non-party were fair game. *But you're not going to be using this witness to*

### 3. *Closing Arguments*

During closing arguments, the radiologists argued, *inter alia*, that Mr. Reiss's injuries were caused by the conduct of the non-party physicians, Dr. Davalos, Dr. DeLuca, and Dr. Eugene Ahn, and not the radiologists. They pointed out that Dr. Davalos decided not to remove the lymph node in 2011 when he removed Mr. Reiss's cancerous kidney. They noted that, although Dr. DeLuca assumed that the lymph node was cancerous, he failed to order a biopsy and failed to consult a vascular surgeon concerning whether it could be removed. Similarly, they pointed out that Dr. Eugene Ahn did not refer Mr. Reiss to a vascular surgeon even after the lymph node had increased in size since 2011. Finally, the radiologists pointed out that Dr. Singer had testified that had a biopsy been performed at any time between 2011 and 2014, it would have shown cancer in the lymph node.

### 4. *Verdict Sheet*

At the end of the trial, the court and the parties discussed the verdict sheet. In total, the verdict sheet contained seven questions. Questions 1 through 4 asked whether the Defendant radiologists, Dr. Bracey and Dr. Sung Kee Ahn, had breached the standard of care, and whether their breach, if any, was a cause of Mr. Reiss's injury. The verdict sheet

---

> *render an opinion as to the negligence or causation of some other actor*, especially in view of the fact that there was no [Rule 2-]402(g) designation by the defendants of a plaintiff's expert.

(Emphasis added). After defense counsel explained that they had filed a cross-designation of the Plaintiff's experts, the trial court responded that the "one line-designation" did not provide the specificity required by Maryland Rule 2-402(g) for the designation of experts. As previously noted, the propriety of the court's rulings prohibiting defense counsel from eliciting testimony from Plaintiff's experts related to negligence or causation by non-party physicians are not before us.

instructed the jurors to stop and summon the clerk if they found that neither of the radiologists had breached the standard of care or if they found that the breach, if any, was not a cause of Mr. Reiss's injury.

If the jurors affirmatively answered any Question 1 through 4 and found that one or both of the radiologists were liable, they were to proceed to Question 5 and determine whether Mr. Reiss was contributorily negligent. If the jurors found that Mr. Reiss was contributorily negligent, the jurors were to stop and summon the clerk. If they found that Mr. Reiss was not contributorily negligent, they were to proceed to Question 6.

The crux of this appeal focuses on Question 6, which the jurors were instructed to answer if they had affirmatively answered that one or both of the radiologists breached the standard of care, and that the breach (or breaches) was (or were) a cause of Mr. Reiss's injury, and if they further determined that Mr. Reiss was not contributorily negligent. Question 6 asked the jury to determine whether "a negligent act or acts of Dr. Russell DeLuca or Dr. Julio G. Davalos or Dr. Eugene Ahn were [sic] a substantial factor in causing injury to Plaintiff Martin Reiss?" Question 6 was included on the verdict sheet over Plaintiff's objection.

Regardless of their answer to Question 6, the jurors were instructed to proceed to Question 7, which asked them to compute Mr. Reiss's economic and non-economic damages.[7]

---

[7] The verdict sheet is replicated in Appendix A of this opinion.

## 5. *The Verdict*

The jurors did not follow the instructions on the verdict sheet. After answering Questions 1 through 5 in the negative—finding that neither radiologist had breached the standard of care, and further finding that Mr. Reiss was not contributorily negligent—the jurors answered "yes" to Question 6, finding that the non-party physicians' "negligent act or acts" had been a "substantial factor" in causing Mr. Reiss's injuries. They completed the damages portion of the verdict sheet, awarding Mr. Reiss over $4.8 million in economic damages, notwithstanding that they determined that the actual Defendants were not liable.[8]

After the jury returned its aberrant findings, the court advised the jurors that they had reached an inconsistent verdict. The court explained to the jury that because they had found that the Defendants had not breached the standard of care, it was unnecessary for them to consider the remaining questions. Over Mr. Reiss's objections, the court sent the jurors back to deliberate with another copy of the same verdict sheet. Mr. Reiss's counsel commented that the court had submitted Question 6 over his objection, and the jurors had answered it in the affirmative, which, he said, "is probably why" they answered the questions about the Defendants' breach in the negative.

After further deliberating, the jury returned another verdict finding that the Defendants had not breached the standard of care. This time, the jury followed the

---

[8] The aberrant verdict sheet completed by the jury is reproduced in Appendix B of this opinion.

instructions and did not answer any other questions on the verdict sheet, nor did it complete the damages portion of the verdict sheet.[9]

Mr. Reiss moved for a new trial on the basis of the verdict sheet. The court denied his motion, and he timely appealed.

## C. Court of Special Appeals

The Court of Special Appeals reversed the judgment of the circuit court and remanded the case for a new trial. *Reiss v. Am. Radiology Servs., LLC*, 241 Md. App. 316 (2019). The intermediate appellate court held that "the radiologists could not generate a defense of non-party medical negligence without suitable expert testimony, to a reasonable degree of medical probability, that the non-party breached the standard of care." *Id.* at 342. Because the radiologists presented no such testimony, the Court of Special Appeals concluded that "the circuit court erred in submitting the question of non-party medical negligence to the jury." *Id.*

Furthermore, the Court of Special Appeals held that the inclusion of Question 6 on the verdict sheet was prejudicial. *Id.* The court explained that it could not "rule out the strong possibility that, in finding that the defendants were not negligent, the jurors were improperly influenced by the unfounded assertions" of negligence by the non-party physicians. *Id.*

---

[9] The corrected verdict sheet completed by the jury is reproduced as Appendix C to this opinion.

13

The radiologists appealed, and we granted their petition for writ of *certiorari* to answer the following questions, which we have rephrased:[10]

1.　　In a medical negligence case, where a defendant denies liability and asserts negligence by a non-party physician as part of its defense, is expert testimony required to establish the non-party physician's negligence and that the negligence was a proximate cause of the harm?

2.　　If expert testimony is required to establish non-party medical negligence and the trial court erred in submitting the question of non-party medical negligence to the jury, was the error prejudicial?

For the reasons set forth below, we answer both questions in the affirmative and affirm the judgment of the Court of Special Appeals.

## II.

## Discussion

### A. *Standard of Review*

The issue in this case involves a trial court's application and interpretation of Maryland law concerning whether we require expert testimony in a medical malpractice case to establish medical negligence by a non-party, where the defendant denies liability

---

[10] The questions presented in Petitioners' petition for writ of *certiorari* were:

1. Did the Court of Special Appeals err in interpreting and extending *Copsey*[ *v. Park*, 453 Md. 151 (2017),] to require a medical malpractice defendant arguing non-party negligence to present standard-of-care expert testimony where the defendant is not asserting non-party negligence as an affirmative defense?

2. Even assuming *arguendo* that it was error for the Circuit Court to submit the question of non-party negligence to the jury, did the Court of Special Appeals err in concluding that the error was prejudicial based solely on an initially completed juror questionnaire that was promptly corrected?

and raises non-party medical negligence as an alternative causation theory. Where a case involves a trial court's interpretation and the application of Maryland case law, we determine whether the lower court's conclusions are legally correct under a *de novo* standard of review. *See Plank v. Cherneski,* 469 Md. 548, 569, slip op. at 13 (2020) (citations omitted).

Additionally, the legal issue arises within the context of a verdict sheet, in which the trial court permitted the jury to consider the issue of medical negligence and causation of non-party physicians where no expert testimony was presented to support the assertion of negligence and causation. Generally, we review alleged errors in a circuit court's use of a verdict sheet for abuse of discretion. *S & S Oil, Inc. v. Jackson*, 428 Md. 621, 629 (2012); *Consol. Waste Indus. v. Standard Equip. Co.*, 421 Md. 210, 220 (2011). "Under the abuse of discretion standard," however, we will "overturn a trial judge's decision to use a particular verdict sheet if we find both that the trial judge committed legal error and that the error prejudiced the party objecting to the error." *S & S Oil*, 428 Md. at 629 (citations omitted) (cleaned up). Furthermore, "a court's discretion is always tempered by the requirement that the court correctly apply the law applicable to the case." *Schlotzhauer v. Morton*, 224 Md. App. 72, 84 (2015) (internal quotations omitted).

In the case before us, the radiologists argue that the Court of Special Appeals erred in interpreting and extending *Copsey v. Park*, 453 Md. 141 (2017), to require a medical malpractice defendant arguing non-party negligence to present standard of care expert testimony where the defendant is not asserting non-party negligence as an affirmative defense. We begin our analysis with a discussion of two opinions from the Maryland

15

appellate courts that address the relevance of non-party medical negligence as part of a defense.

## B. Relevance of Non-Party Medical Negligence Generally

In two relatively recent cases, this Court and the Court of Special Appeals have held that evidence of non-party negligence is relevant and admissible in medical malpractice cases. *Martinez ex rel. Fielding v. Johns Hopkins Hospital*, 212 Md. App. 634 (2013), was the first Maryland decision to address a non-party's negligence in a medical malpractice action. In *Martinez*, the Court of Special Appeals discussed the admissibility of evidence of a third-party's prior negligence when the defendant generally denies liability. *Id.* at 665. In that case, the parents of a minor child sued a hospital alleging that by negligently failing to perform a timely caesarean section, the hospital had caused the child to suffer birth injuries, including cerebral palsy. *Id.* at 643–44. The child's mother, who was ten days overdue, chose to have a natural birth at home with the assistance of a registered nurse midwife. *Id.* at 640. The mother was in labor for over 19.5 hours before the midwife eventually called an ambulance. Ultimately, the baby was not delivered in good health and suffered from cerebral palsy, among other things. *Id.* at 643. The hospital argued that the midwife was "solely responsible" for the injuries. *Id.* at 644.

Prior to trial, the circuit court granted the parents' motion *in limine* to exclude evidence, including expert testimony, about the standard of care for midwives and the midwife's breach of the standard of care in treating the mother. *Id.* at 647–48. The jury found in favor of the parents, and the hospital appealed. *Id.* at 639. The Court of Special Appeals reversed and held that "evidence of both negligence and causation attributable to

16

a non-party is relevant where a defendant asserts a complete denial of liability" and "the [h]ospital was entitled to try to convince the jury that not only was it *not* negligent and *not* the cause of [the baby's] injuries, but that [the midwife] *was* negligent and *did* cause the injuries." *Id.* at 664–65 (emphasis in original). Accordingly, the Court of Special Appeals held that the circuit court erred in excluding evidence of the standard of care applicable to midwives and whether the midwife breached the standard of care in treating the mother. *Id.* at 666.

In excluding the evidence related to the standard of care applicable to midwives generally, and the midwife's breach in this instance, the circuit court reasoned that the midwife's breach would not excuse the hospital's negligence. The Court of Special Appeals rejected the trial court's reasoning, because the trial court presumed that the hospital was negligent. *Id.* at 662. The intermediate appellate court pointed out that the hospital's defense was that it was not negligent at all, and that it did not cause the injury. *Id.* Because the hospital sought to prove that the midwife's negligence was the sole cause of the child's injuries, it was entitled to introduce evidence of the standard of care applicable to midwives, and the midwife's breach in treating the mother in this instance. *Id.* at 666. The court concluded that "[b]y precluding such evidence, the jury was given a materially incomplete picture of the facts, which denied the [h]ospital a fair trial." *Id.*

In *Copsey v. Park*, 453 Md. 141 (2017), we considered a slightly different aspect of the defense of non-party medical negligence. In that case, a decedent's widow filed suit against a radiologist and several subsequent treating physicians, alleging that they had failed to diagnose the medical conditions that led to her late husband's fatal stroke. *Id.* at

17

152. The radiologist, Dr. Park, argued that he was not negligent, and that the medical negligence of the subsequent treating physicians was a superseding cause of the plaintiff's injuries. *Id.* at 153.

Prior to trial, the plaintiff dismissed her claims against all of the treating physicians, except Dr. Park and his employer. *Id*. at 152–53. The circuit court denied the plaintiff's motion *in limine* to prevent Dr. Park from introducing evidence that the negligence of the subsequent treating physicians was a superseding cause of the claimed injuries. *Id.* at 153.

At trial, the evidence was that, in the days after Dr. Park was alleged to have negligently failed to diagnose blockages in the patient's vertebral arteries, the patient's condition continued to worsen significantly. *Id.* at 151. While hospitalized, he exhibited symptoms of a stroke, and an MRI suggested an acute infarction (an obstruction of the blood supply) in the brain. *Id.* Despite the concerning MRI results, the patient was released from the hospital. When the patient returned home from the hospital, he suffered a stroke. *Id.* at 151–52. His wife took him back to the hospital where he was diagnosed with having multiple acute brainstem and cerebellar strokes. *Id.* at 152. His condition continued to deteriorate, and he died three days later. *Id.* A number of experts, including one of the plaintiff's experts, testified that the subsequent treating physicians had breached the standard of care by failing to communicate with one another and the patient about the disturbing results of the new MRI scan. *Id.* at 154–55. One expert testified that, because of the negligence of the subsequent treating physicians, the decedent did not receive the emergency treatment that would have saved his life. *Id.* at 155. Instead, he was released

18

from the hospital unaware of his condition, where he suffered a stroke at home. *Id.* The jury found that Dr. Park did not breach the standard of care. *Id.* at 156.

On appeal, the Court of Special Appeals affirmed the judgment of the circuit court. *Copsey v. Park*, 228 Md. App. 107 (2016). On *certiorari* review, we affirmed the judgment of the Court of Special Appeals and held that "a defendant generally denying liability may present evidence of a non-party's negligence and causation as an affirmative defense." *Copsey*, 453 Md. at 156. We held that a physician could introduce evidence of a non-party's medical negligence to prove "that he was not negligent and that if he were negligent, the negligent omissions of the other three subsequent treating physicians were intervening and superseding causes of the harm to the patient." *Id.* at 156–57. We explained that "[e]vidence of a non-party's negligence was relevant and necessary in providing Dr. Park a fair trial; [and that] the potential prejudice did not outweigh the probative value of the evidence." *Id.* at 156. We also held that "causation was an issue for the jury to determine." *Id.*

In reaching our decision, we rejected the plaintiff's contention that we should distinguish *Martinez* because the non-party negligence in *Martinez* preceded the hospital's alleged negligence, while the non-party negligence in *Copsey* came after Dr. Park's alleged negligence. *Id.* at 161. We explained that "in addition to claiming that the other treating physicians were superseding causes, Dr. Park also completely denied any liability." *Id.* We concluded that evidence of non-party negligence was admissible because, like the defendant hospital in *Martinez*, which denied liability, "'the jury would have been given a

19

materially incomplete picture of the facts, which would have denied [Dr. Park] a fair trial.'"

*Id.* at 161–62 (some internal brackets omitted) (quoting *Martinez*, 212 Md. App. at 666).

In summary, the holdings in *Martinez* and *Copsey* establish the following: A defendant in a medical malpractice case generally may introduce evidence of a non-party's medical negligence to prove that he or she was not negligent, or that his or her negligence did not cause the plaintiff's injuries. Additionally, a defendant generally may introduce evidence of a non-party's medical negligence to prove that the non-party's acts or omissions were a superseding cause that cleaved the chain of causation running from the defendant's negligence.

The question in this case is, where evidence of non-party negligence is relevant to a defendant's defense, what *level* of evidence is *required* to generate a jury question of non-party medical negligence? Petitioners argue that they are not required to present expert standard of care testimony where a defendant is not asserting non-party negligence as an affirmative defense. Petitioners assert that *Copsey* and *Martinez* have "no application" in this case because the radiologists did not raise non-party negligence as an affirmative defense. Petitioners point out that they denied liability and raised non-party negligence as an alternative causation theory, and therefore, the burden of persuasion never shifted to the defense to require proof of an affirmative defense. Because they had no burden of persuasion, Petitioners posit that they were not required to provide standard of care evidence of non-party negligence.

Respondent counters that it is irrelevant whether a defendant asserts non-party negligence as an affirmative defense or as an alternative causation theory in connection

20

with a general denial of liability. Respondent argues that a jury should not be permitted to make a factual determination that a non-party physician's conduct was "negligent" unless the evidentiary prerequisites for such a finding have been satisfied. Respondent contends that the evidentiary prerequisites were not satisfied in this case.

For the reasons set forth below, we reject Petitioners' argument that expert testimony is only required to establish non-party negligence and causation where a defendant is raising non-party negligence as an affirmative defense.

### C. *Medical Negligence – The Requirement of Expert Testimony Generally*

We start our analysis with the evidence that is required under Maryland law to establish medical negligence generally. As we have stated time and again, a "medical malpractice tort" is a "traditional negligence claim." *Armacost v. Davis*, 462 Md. 504, 525 (2019) (citations and quotations omitted). Accordingly, "the general principles which ordinarily govern in negligence cases also apply in medical malpractice claims." *Id.* at 525–26 (quoting *Shilkret v. Annapolis Emergency Hosp. Ass'n*, 276 Md. 187, 190 (1975)). According to these well-known principles, the plaintiff must establish at trial (1) the defendant's duty based on the applicable standard of care, (2) a breach of that duty, (3) that the breach caused the injury claimed, and (4) damages. *Id.* at 526 (citation omitted).

"Generally, the applicable standard of care in a negligence action is whether the defendant acted reasonably as measured against a hypothetical 'reasonable' similar actor in similar circumstances." *Armacost*, 462 Md. at 526 (citations omitted); *see also* Prosser & Keeton on Torts, § 32 at 173–75 (5th ed. 1984). Where a member of a profession has special training and expertise, their conduct is "measured against the standard of a

21

hypothetical reasonable person with similar training and expertise." *Armacost*, 462 Md. at 526. A professional, such as a physician, owes a special duty of care to a patient "that is beyond the duty that would be owed by a general member of the public and that is commensurate with the professional's training and expertise." *Id.* (citing *Jacques v. First Nat'l Bank*, 307 Md. 527, 541 (1986)); *see also Shilkret*, 276 Md. at 200 (explaining that when general principles of negligence are applied specifically to the actions of a physician, the "physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he [or she] belongs, acting in the same or similar circumstances").

Because the duty of care owed by a professional is based upon the professional's special expertise, its parameters may not be within the common knowledge of the average layperson juror. *Armacost*, 462 Md. at 526. Accordingly, we require expert testimony to establish the professional's duty and to explain how the professional's breach caused the injury. *See Johnson v. State*, 457 Md. 513, 530 (2018) (explaining that in general, expert testimony is required "when the subject of the inference [to be drawn by the jury] is so particularly related to some science or profession that it is beyond the ken of the average layman . . . .") (quoting *Bean v. Dep't of Health & Mental Hygiene*, 406 Md. 419, 432 (2008)) (citations omitted). In the context of most medical malpractice cases, we have articulated that "because of the complexity of the subject matter, expert testimony is required to establish negligence and causation." *Meda v. Brown*, 318 Md. 418, 428 (1990) (citation omitted); *see also Rodriguez v. Clarke*, 400 Md. 39, 71 (2007) ("Because the gravamen of a medical malpractice action is the defendant's use of suitable professional

22

skill, which is generally a topic calling for expert testimony, this Court has repeatedly recognized that expert testimony is required to establish negligence and causation.") (internal quotations and citations omitted).

Juries are not permitted to simply infer medical negligence in the absence of expert testimony because determinations of issues relating to breaches of standards of care and medical causation are considered to be beyond the ken of the average layperson. The resolution of such issues involves knowledge of complicated matters such as "human anatomy, medical science, operative procedures, areas of patient responsibility, and standards of care." *Orkin v. Holy Cross Hosp.*, 318 Md. 429, 433 (1990).

Additionally, in a medical malpractice case, "Maryland law requires that an expert's testimony be held to a 'reasonable degree of medical probability' to ensure that the expert's opinion is more than speculation or conjecture." *Kearney v. Berger*, 416 Md. 628, 651–52 (2010) (internal quotations and citations omitted). When a medical expert is asked whether he or she holds an opinion "to a reasonable degree of medical certainty" or "within a reasonable degree of medical probability[,]" such "wooden phrases are required to make sure that the expert's opinion is more than speculation or conjecture." Joseph F. Murphy, Jr., *Maryland Evidence Handbook*, § 1404 at 649 (4th ed. 2010). In fact, "appellate courts have made clear that expert testimony based upon anything less than a reasonable degree of probability may be properly excluded." *Karl v. Davis*, 100 Md. App. 42, 52–53 (1994) (citing *Pierce v. Johns-Mansville Sales Corp.*, 296 Md. 656, 666 (1983)); *Hines v. State*, 58 Md. App. 637, 670 (1984). In addition to ensuring that the opinions are based upon more than speculation or conjecture, the subsequent repetition of a phrase like "reasonable

23

degree of medical probability" during the testimony of key witnesses emphasizes to the jury that it is to view reasonableness through the eyes of a medical practitioner. *Armacost*, 462 Md. at 533 n.17.

### D. The Requirement of Expert Testimony Where Defendant Attempts to Generate a Factual Issue Involving Non-Party Medical Negligence

Despite the general rule that requires expert testimony to establish medical negligence and causation, the radiologists argue that they are excused from this basic evidentiary threshold because they did not assert non-party medical negligence as an affirmative defense. "An affirmative defense is one which directly or impliedly concedes the basic position of the opposing party, but which asserts that notwithstanding that concession the opponent is not entitled to prevail because he is precluded for some other reason." *Armstrong v. Johnson Motor Lines, Inc.*, 12 Md. App. 492, 500 (1971); *see also* Affirmative Defense, Black's Law Dictionary (11th ed. 2019) (defining affirmative defense as: "A defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true. The defendant bears the burden of proving an affirmative defense.").

Petitioners attempt to distinguish their trial strategy (*i.e.,* failing to introduce expert testimony on non-party negligence) from the defendants' trial strategy in *Copsey* and *Martinez* (*i.e.*, introducing or attempting to introduce expert testimony on non-party negligence), arguing that expert testimony was unnecessary because they did not assert an affirmative defense. This argument does not hold water. In *Martinez*, the hospital did not raise non-party medical negligence as an affirmative defense. *See* 212 Md. App. at 644.

24

Just like the radiologists here, the defendant hospital denied liability and argued an alternative theory of causation based upon the negligence of a non-party, specifically, the midwife. *Id.* In *Copsey*, we recognized that, in the appropriate case, defendants have the right to introduce evidence of non-party medical negligence both to defend against a claim of medical negligence and to establish what this Court described as an affirmative defense of superseding causation. *Copsey*, 453 Md. at 174.

Our analysis does not end here, because although the defendants in *Martinez* and *Copsey* presented expert testimony on the issue of non-party negligence, neither of those cases addressed whether such evidence is *required* in order to raise the issue, as in this case.

We agree with the Court of Special Appeals that expert testimony is required to establish non-party medical negligence without regard to whether a defendant is raising the non-party medical negligence as an affirmative defense or in connection with a general denial of liability. *See Reiss*, 241 Md. at 341. "We generally require expert testimony about a breach of a professional standard of care because the subject matter is beyond the understanding of ordinary lay jurors." *Id.* The necessity of expert testimony to establish medical negligence and causation is rooted in the *evidentiary requirement* that such issues are beyond the general knowledge and comprehension of layperson jurors. As the Honorable Joseph F. Murphy, Jr. explained,

> Someone must put the ball into play. *Generating an issue involves production of evidence sufficient to require that the factfinder resolve a contested issue.* In order to get a jury instruction you must produce evidence that supports it. The

25

> jury is not permitted to find that a particular fact exists unless there is an evidentiary basis for this conclusion.

*Maryland Evidence Handbook*, § 403 at 132 (emphasis added). As part of its defense, to the extent that the Defendants chose to raise and argue that a non-party physician's negligence caused the Plaintiff's injury, they were required to produce and generate sufficient admissible evidence to enable the jury to make a factual finding that non-party physician negligence, in fact, existed in this case. The requirement that the defense produce admissible evidence in the form of expert testimony is tied to the defendant's *burden of production* of admissible evidence, not the burden of persuasion. As noted above, in Maryland, that evidentiary threshold requires expert testimony because matters involving medical negligence are beyond the common knowledge of the average layperson. As the Court of Special Appeals reasoned, the "subject matter does not become any more comprehensible to lay jurors merely because it is presented as a defense to a claim of malpractice, and not as the basis for a claim of malpractice." *Reiss*, 241 Md. at 341. Put another way, the need for expert testimony to enable a lay jury to decide complex medical issues is not obviated simply because the defense is "I was *not* negligent, but someone else was negligent and caused the injury," rather than "I *was* negligent, but someone else was negligent after me and caused the injury."

As the Court of Special Appeals aptly reasoned,

> if defendants want to contest a plaintiff's allegations of medical negligence by showing that they themselves adhered to the standard of care, they would typically need to call an expert, who would have to express his or her opinions to a reasonable degree of probability. It follows that if defendants want to contest a plaintiff's allegations of medical negligence with

26

> evidence of a non-party's medical negligence, they must call an expert, who must express his or her opinions to a reasonable degree of probability . . . .

*Reiss*, 241 Md. App. at 341–42. We agree with this analysis, with one clarification, below.

We hold that where a defendant elects to pursue a defense that includes non-party medical negligence, the defendant must produce the requisite expert testimony necessary to establish medical negligence and causation, unless the non-party's medical negligence is so obvious that ordinary laypersons can determine that it was a breach of the standard of care. We are not holding or requiring that the defendant must call his or her own expert to generate the issue to prove that a non-party physician or "the empty chair" was the negligent person. Consistent with our jurisprudence on the issue,[11] assuming discovery rules are satisfied, the defendant may elicit expert standard of care testimony through cross-examination of plaintiff's expert, or may call an expert of his or her own, but the defendant is not required to call an expert of his or her own.

### E. *Lack of Admissible Expert Opinion Testimony to Permit a Finding of Non-Party Physician Negligence*

As noted above, the radiologists did not identify or call any expert witness to testify that the non-party physicians breached the applicable standard of care, nor did they establish that a breach of the applicable standard of care proximately caused Mr. Reiss's injury. Despite the absence of expert testimony, the radiologists contend that they established a sufficient factual predicate for the jury to conclude that the non-party physicians breached their respective standards of care. Specifically, the radiologists point

---

[11] *See, e.g., Copsey v. Park*, 453 Md. 151, 154–55 (2017).

to several arguably critical comments made by the Plaintiff's experts, Dr. Collier and Dr. Singer, concerning the care rendered by the non-party physicians. In its opinion, the Court of Special Appeals meticulously parsed through those comments and concluded that they fell short of the requisite evidentiary threshold—that is, expert testimony to a reasonable degree of medical probability that a non-party physician breached the standard of care and that the breach caused the Plaintiff's injuries. *Reiss*, 241 Md. App. at 336–39. Our independent review of the testimony leads us to the same conclusion.

As the Court of Special Appeals observed, no expert witness testified, to a reasonable degree of medical probability that: (1) Dr. Davalos breached the standard of care when he failed to remove the lymph node in 2011; (2) Dr. DeLuca breached the standard of care between 2011 and 2014 by not referring Mr. Reiss to a surgeon and not ordering a biopsy on the lymph node; or (3) Dr. Eugene Ahn breached the standard of care in 2015 by not referring Mr. Reiss to a surgeon. *Id.* at 336–37. Despite there being no expert testimony to establish that these actions fell below the physicians' standard of care, defense counsel pointed out all of these alleged deficiencies in care to the jury in closing. Without such expert testimony, the jury had no factual basis upon which to conclude that these acts, or failures to act, constituted negligence.

In their effort to demonstrate a factual predicate for the jury to conclude that Dr. Davalos breached the standard of care in 2011 by not removing the lymph node, the radiologists point to the testimony of Mr. Reiss's expert vascular surgeon, Dr. Collier, who testified that the lymph node could have been safely removed or resected at any time prior to 2015. We agree with the Court of Special Appeals that this testimony does not establish,

28

to a reasonable degree of medical probability, that the standard of care required that Dr. Davalos remove the lymph node during the 2011 operation. *Id.* at 337. Nor does this testimony establish that Dr. Davalos's professional judgment fell below the standard of a reasonably competent surgeon when he apparently concluded the benefits of removing the lymph node during that particular surgery were outweighed by the risk that Mr. Reiss might die on the operating table if he inadvertently damaged the inferior vena cava. *Id.* As the Court of Special Appeals expressed, "[a]t most, Dr. Collier's testimony evidenced a disagreement on a matter of professional judgment – not unlike the apparent disagreement between Dr. Collier, who thought that the lymph node was no longer resectable, and the radiologist's expert, Dr. Black, who thought that it was still resectable even as of the date of trial." *Id.*

In arguing that they established a sufficient factual predicate for the jury to conclude that Mr. Reiss's oncologists, Dr. DeLuca and Dr. Eugene Ahn, breached the standard of care in not referring Mr. Reiss to a surgeon to remove the lymph node, the radiologists point to the testimony of Mr. Reiss's expert oncologist, Dr. Singer. First, they cite to Dr. Singer's testimony "that all of Mr. Reiss's doctors knew that the lymph node was probably cancerous." *Id.* at 338. "Second, they cite Dr. Singer's testimony that the 'preferred treatment' would have been to remove the [lymph] node between 2011 and 2014 because, in his words, 'you always want to remove cancer from the body.'" *Id.*

We agree with the Court of Special Appeals that

> Dr. Singer's broad, general pronouncements, including his statements about the "preferred treatment," do not equal expert testimony, to a reasonable degree of medical probability, that

29

the standard of care required Dr. DeLuca and Dr. Eugene Ahn to refer Mr. Reiss for surgery. *See Lane v. Calvert*, 215 Md. 457, 464 (1958) (holding that a question about what expert himself would have done "did not go to the standard of the profession"); *Ramsey v. Physicians Mem'l Hosp*., 36 Md. App. [] 42, 49 (1977) (holding that an expert's statement about what he or she personally would have done in treating the patient is not evidence of applicable standard of care).

*Reiss*, 241 Md. App. at 338 (parallel citations omitted). As the intermediate appellate court pointed out, Dr. Singer's generalized statements "did not address the specific circumstances that the oncologists confronted in their treatment of Mr. Reiss." *Id.* For example, the court noted, "Dr. Singer did not address why Dr. DeLuca had a professional obligation to refer Mr. Reiss" to another surgeon when Mr. Reiss's surgeon, Dr. Davalos, "had told him that the lymph node could not be safely removed," the lymph node was apparently shrinking in response to chemotherapy, and the "CT scans led him to believe that the cancer was in remission." *Id.* "Similarly, Dr. Singer did not address how Dr. Eugene Ahn had a professional obligation to refer Mr. Reiss for surgery even though his surgical colleague had informed him that surgery would not be in Mr. Reiss's best interest." *Id.*[12]

Based upon our review of the evidence, it is obvious that the Petitioners did not present expert testimony, to a reasonable degree of medical probability, that the non-party physicians breached the standard of care. Additionally, Dr. Singer's generalized

---

[12] Counsel for the radiologists argued at closing that Dr. DeLuca and Dr. Eugene Ahn should have referred Mr. Reiss to a vascular surgeon. There is no expert testimony in the record which established that the standard of care required that the treating oncologist refer Mr. Reiss to a vascular surgeon.

statements of "preferred treatment" and wanting to "always remove cancer from the body" do not establish a factual predicate of negligence by the non-party physicians, nor do such statements establish causation. Without such testimony, the circuit court erred in submitting the question of non-party medical negligence to the jury.

### F. *The Submission of Question 6 on the Verdict Sheet Was Not Harmless Error*

Given the Defendants' failure to present evidence of non-party medical negligence, we turn to the verdict sheet, which asked the jury to make a factual determination on whether "a negligent act or acts" of Dr. DeLuca, Dr. Davalos, or Dr. Eugene Ahn were a "substantial factor in causing injury to Plaintiff Martin Reiss." As discussed above, the question was erroneously submitted to the jury because the defense did not produce admissible evidence to support a factual determination by the jury of non-party medical negligence.[13] A trial court may not submit an issue to the jury unless there is some admissible evidence that generates the question. *See Barbosa v. Osbourne*, 237 Md. App. 1, 10 (2018) (collecting cases).

Having determined that the trial court abused its discretion by submitting the issue of non-party negligence to the jury without the requisite expert testimony, we consider whether the error was prejudicial. When a circuit court abuses its discretion, its decision

---

[13] Even assuming that the jury had found that the Defendants breached their duty and caused injury and followed the instructions and proceeded to answer Question 6 in the affirmative, it is unclear what effect the question would have had on the Defendants as far as their obligation to satisfy the judgment. The Defendants did not file a third party claim against these physicians. Similarly, an affirmative response to Question 6 would not have established a claim for contribution based upon joint and several liability because the requisite expert testimony was lacking.

31

only warrants reversal if the court's error was prejudicial. *S & S Oil*, 428 Md. at 629 (citations omitted). This Court has previously stated that submission of extraneous or improper questions to the jury is not necessarily prejudicial. *Flores v. Bell*, 398 Md. 27, 36 (2007). In these cases, the presence of the question must likely have had some effect on the jury's verdict, *see id.* at 37, which requires an examination of the facts of each particular case. *Fry v. Carter*, 375 Md. 341, 356–57 (2003) (citation omitted). Unless the prejudice is obvious, we determine whether it nonetheless exists based on the "context and magnitude of the error." *Barksdale v. Wilkowsky*, 419 Md. 649, 665 (2011). Prejudice arises only when an error probably affected the verdict, not when it merely possibly did so. *Armacost v. Davis*, 462 Md. 504, 524 (2019) (citation omitted).

Fundamentally, our prejudice analysis focuses on whether an error undermines our faith in the jury's verdict. *See Barksdale*, 419 Md. at 667 (quoting Roger J. Traynor, *The Riddle of Harmless Error* 64 (1970) (stating that an error "can be declared prejudicial for the simple reason that the court is unable to declare a belief one way or the other as to the probable effect of the error on a particular judgment. There is also the preeminent reason that such errors are so subversive of the judicial process as to make reversal necessary.")).

Petitioners contend that assuming that Question 6 was in error, it was harmless because the jury resumed deliberations and "promptly" returned with a verdict sheet in favor of the Defendants. We disagree with the Petitioners.

We agree with the Court of Special Appeals that the error on the verdict sheet was prejudicial in this case. The jurors' confusion is obvious from the face of the aberrant verdict sheet—they awarded Mr. Reiss $4.8 million in damages, even though they found

32

that the Defendants were not negligent. They purported to award damages solely upon a factual determination that the non-party physicians, Drs. Davalos, DeLuca, and Eugene Ahn, were negligent and caused Mr. Reiss's injuries. They made this factual determination notwithstanding the fact that there was no admissible evidence that any of those physicians breached the standard of care. As the intermediate appellate court aptly concluded, "[t]he jurors could not have reasonably been expected to put that conclusion out of their minds when the circuit court directed them to return to their deliberations and complete a second verdict sheet." *Reiss*, 241 Md. App. at 342.

As this Court explained in *Copsey*, the question of whether a defendant is negligent is inextricably intertwined with allegations of non-party negligence. 453 Md. at 167 n.7. There is an intrinsic indirect relationship between the two. The more the jury hears that the negligence of a third party caused the injury, the less likely the jury may be to find that the named defendant was negligent in causing the injury. Like the Court of Special Appeals, "we cannot rule out the strong possibility that, in finding that the defendants were not negligent, the jurors were improperly influenced by the unfounded assertions that Dr. Davalos, Dr. DeLuca, or Dr. Eugene Ahn were." *Reiss*, 241 Md. App. at 342–43. If the jury believed that Mr. Reiss suffered injuries as a result of professional negligence, they were invited by the defense to find that the non-party physicians were at-fault. During closing arguments, defense counsel repeatedly blamed the non-parties for the Plaintiff's medical injury. When the jury was then given a verdict sheet, which asked them to determine whether the non-parties' "negligent acts" were a "substantial factor in causing injury to Plaintiff," we conclude that the jury's deliberations were irreparably

33

contaminated.  Based upon this record, we cannot conclude that the jury would have found that the Defendants were not negligent, if they had not considered "negligent" acts of the non-party physicians.  We determine that more likely than not, the error influenced the verdict.  Accordingly, we reverse and remand for a new trial.

## III.

## Conclusion

We hold that, to generate a defense of non-party medical negligence, expert testimony is required to establish a breach of the standard of care by the non-party and to establish causation.  We have consistently held that, other than an occasional "obvious injury" case, expert testimony is required to establish medical negligence and causation, which is rooted in the notion that such complex issues are beyond the general knowledge and comprehension of layperson jurors.  Accordingly, our requirement that medical negligence be established by expert testimony is tied to a party's burden of producing admissible evidence sufficient to generate an issue for the jury.  The need for expert testimony is not alleviated because a defendant asserts non-party medical negligence as an alternative causation theory in connection with a general denial of liability.  In other words, the subject matter—medical negligence—does not become less complex or fall within a jury's common knowledge simply because it is raised as a defense.  We are not holding or requiring that the defendant must call his or her own expert to generate the issue to prove that the non-party physician was the negligent person.  Assuming the discovery rules are satisfied, the defendant may elicit expert standard of care testimony through cross-

34

examination of plaintiff's expert, or may call an expert of his or her own, but the defendant is not required to call an expert of his or her own.

Moreover, to be legally sufficient, expert testimony in a medical malpractice action must be expressed to a reasonable degree of medical probability or certainty. In this case, the Defendants' attempt to rely upon the general pronouncements of preferred treatment by the Plaintiff's experts fell short of meeting the legal standard of establishing to a reasonable degree of medical probability that the non-party physicians' conduct fell below the standard of care and caused the Plaintiff's injury. With no expert testimony to establish medical negligence or causation, the circuit court erred in submitting the question of non-party medical negligence to the jury. We further hold that the error on the verdict sheet was prejudicial in this case.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY PETITIONERS.**